**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DAVID D. WISE,                                      )
                                                    )
                        Plaintiff,                  )
                                                    )
            vs.                                     )        Civil Action No. 10-1677
                                                    )        Judge Nora Barry Fischer
WASHINGTON COUNTY; *and* CAPTAIN                    )
MICHAEL KING, *individually and in his*             )
*capacity as a Washington County Corrections*       )
*Officer*,                                          )
                                                    )
                        Defendants.                 )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Presently before the Court is Defendants' Motion for Sanctions against Plaintiff's counsel Lawrence H. Fisher, Esq. ("Fisher"). As the nature of the Motion demands a review of the entire record, the Court first sets forth a detailed overview of the proceedings. *See, e.g.*, *Baker Indus., Inc. v. Cerberus Ltd.*, 764 F.2d 204, 209 (3d Cir. 1985) (reviewing the entire record in affirming the district court's finding of bad faith).

### II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

#### A.    Initiation of the Suit and Early Proceedings

This civil rights action was brought pursuant to 42 U.S.C. § 1983 by Plaintiff David Wise ("Wise" or "Plaintiff") against Washington County, Captain Michael King ("King"), and various Washington County Correctional Facility ("WCCF") correctional officers and nurses, alleging that they violated his Eighth Amendment right of protection from cruel and unusual punishment and his Fourteenth Amendment Equal Protection rights. (Docket No. 1). Plaintiff also set forth

assault and battery claims against certain of the officers and nurses. (*Id.*). The parties agreed that Wise's seizure disorder, which he has had since he was approximately five years old, constituted a serious medical need. (Docket No. 103 at 14); (Docket No. 308-1 at 8-10, 15).

Wise did not take his medication as prescribed on September 13, 2006. (Docket No. 228 at 3). Consequently, he had a seizure while driving and caused an accident killing a passenger in another car. (*Id.*); *Commonwealth v. Wise*, CP-63-CR-0001211-2009 (Ct. Comm. Pl. Wash. Cnty.).[1] He was convicted of vehicular manslaughter and subsequently sentenced to a term of incarceration beginning on May 1, 2010. (Docket No. 228 at 3). During processing two days later, WCCF completed a Treatment Intake Screen for Wise, at which time he informed WCCF personnel of his seizure disorder. (Docket No. 103 at 2).

With this backdrop, Wise alleged that he received inadequate medical care for three seizures he suffered at WCCF, with the first occurring on May 15, 2010. (Docket No. 29, *passim*); (Docket No. 103 at 2). He maintained that he had a second seizure on May 26th; however, Defendants disputed same. (Docket No. 103 at 4). He then had a second or third seizure on July 16, 2010. (*Id.* at 6-7). Theodore Melencheck ("Melencheck") and Robert Fields ("Fields"), also WCCF inmates, reportedly heard and saw the events surrounding this seizure. (*Id.* at 6-9).

Wise also alleged that he was assaulted and battered by WCCF personnel. (Docket No. 29 at 14-15). Additionally, he made complaints that the correctional officers and nurses taunted and mocked him. (*Id.* at 12); (Docket No. 81-4 at 105:10-106:5).

On release, Wise sought legal representation. Akman & Associates, who had previously represented him in Social Security and criminal matters, referred him to Fisher, who at that time

---

[1] *Crash Injuries Kill Canonsburg Woman*, Washington Observer-Reporter, B2 (Dec. 13, 2006).

was an employee of Cohen & Willwerth, P.C.[2] (Docket No. 273 at ¶¶ 13, 24); (Docket No. 303 at ¶ 5). Fisher had worked for Akman & Associates from 1996 through 2006. (Docket No. 273 at ¶ 13). He went into solo practice in 2013 during the pendency of this case.[3] (*Id.* at ¶ 24).

Upon receiving the referral and medical records from Akman & Associates, Fisher reviewed the file and evaluated the claim. (Docket No. 273 at ¶ 13). He then hired a private investigator[4] to seek out additional information, but this effort was "to no avail." (*Id.* at ¶ 14). Akman & Associates also provided Fisher with their "Negligence Questionnaire"[5] regarding, *inter alia*, Wise's medical treatment. (*Id.* at ¶ 15). Fisher first met with Wise on November 18, 2010 and during this meeting, they reviewed said Questionnaire. (Docket No. 303 at ¶ 2). Fisher then prepared the Complaint. (Docket No. 273 at ¶ 16). Wise verified it, and it was filed on

---

[2] Cohen, Willwerth & Marraccini, LLC, formerly Cohen & Willwerth, P.C., is based in the Philadelphia area and "has been serving diverse legal interests since 1985, with an emphasis on Real Estate, Landlord/Tenant, condominium association representation and commercial litigation services throughout Pennsylvania and New Jersey." http://www.cwm.legal/ (last visited Apr. 16, 2015).

[3] Fisher's website states that he "frequently prevails in high-profile litigation," focuses on complex civil litigation, and is:

> well-positioned to represent various types of litigation and clients, including both individuals and institutions. He places a particular emphasis on preparing and taking cases to trial.
> Mr. Fisher endeavors to provide justice to individuals and entities who have been injured, and to secure for them fair financial compensation from wrongful parties. He works tirelessly to serve his clients' civil litigation needs and to provide the type of personal attention and respect that he believes all clients deserve.
> Mr. Fisher has particular experience in the area of civil rights litigation. Civil rights are guaranteed by the Bill of Rights, and the 13th, 14th, 15th, and 19th Amendments to the United States Constitution. Civil rights include civil liberties (such as the freedom of speech, press, assembly, and religion), as well as due process, the right to vote, equal and fair treatment by law enforcement and the courts, and the opportunity to enjoy the benefits of a democratic society, including equal access to public schools, recreation, transportation, public facilities, and housing.

The Official Site: Lawrence H. Fisher, Attorney & Author, *available at* www.lawrencefisher.com/attorney.html (last visited Apr. 16, 2015).

[4] Other than the investigator's name, Christopher Cicchitto ("Cicchitto"), and the email filed of record at Docket No. 277, the record does not contain any biographical information about this individual. The Court's independent research likewise did not reveal any information.

[5] The Court ordered Fisher to produce said Questionnaire, (Docket No. 301); however, he was unable to locate same, and Akman & Associates did not retain a copy. (Docket No. 303 at ¶¶ 8-9). Thus, he filed a blank version. (Docket No. 303-1).

December 15, 2010. (*Id.* at ¶ 17); (Docket No. 1). He sought exemplary and punitive damages against all Defendants at Counts 1 and 2. (Docket No. 1).

Service was made on King and Washington County on December 27, 2010, and on Kelley and Lehr on January 6, 2011. (Docket Nos. 2-5). After being granted a month-long extension, (CM/ECF, Text Order, Mar. 8, 2011), Defendants' counsel, Edmond R. Joyal, ("Joyal"), filed their Answer on April 7, 2011, (Docket No. 7). The Answer claimed, among other defenses, that punitive damages were not recoverable against the individual Defendants in their official capacities and Washington County and the Complaint failed to state a claim upon which relief could be granted. (*Id.*). Defendants also opted to have this case randomly assigned to a district judge. (Docket No. 9). The matter was then randomly assigned to this Court, with then Chief Magistrate Judge Lisa P. Lenihan referred. (CM/ECF, Text Order, Apr. 14, 2011).

Consistent with the Federal and Local Rules,[6] Judge Lenihan entered an initial Case Management Order and, given the Court's mandatory Alternative Dispute Resolution ("ADR") program, referred the parties to an Early Neutral Evaluation ("ENE")[7] before the Honorable Kenneth Benson.[8] (Docket Nos. 14, 16). Thereafter, the parties engaged in a series of discovery motions. (Docket Nos. 17, 21, 23).

Plaintiff's Amended Complaint, filed June 30, 2011, set forth Eighth Amendment and Equal Protection claims against Washington County, correctional officers: King, Adam Lehr ("Lehr"), and Kelley, and nurses: Victoria Goroncy ("Goroncy"), Autumn Loughman ("Loughman"), Luanne Rossi ("Rossi"), and Jill Nixon ("Nixon") at Counts 1 and 2. (Docket

---

[6] *See* FED.R.CIV.P. 16 and LCvR 16, *available at* http://www.pawd.uscourts.gov/Documents/Forms/lrmanual.pdf (last visited Apr. 16, 2015).

[7] ENE is a process in which an impartial attorney, selected by the parties and with subject matter expertise, provides a non-binding evaluation of the case and is available to assist the parties reach a mutually acceptable agreement. *See Questions and Answers, ADR Program, available at* http://www.pawd.uscourts.gov/Applications/pawdadr/Documents/ADR-Q&AVERSION3MARCH2014.pdf (last visited Apr. 16, 2015).

[8] The Honorable Kenneth Benson was a Magistrate Judge in this Court from 1990 to 2002.

No. 29). At Counts 3 and 4, he pled assault and battery claims against King, Kelley, and Rossi. (*Id.*). The punitive damages claim remained against all Defendants at Counts 1 and 2. (*Id.*). Defendants again raised various defenses in their Answer, including that the Defendants in their official capacities and Washington County, as a municipal defendant, were not subject to punitive damages and were entitled to qualified immunity. (Docket No. 31).

On July 12, 2011, the parties engaged in ENE before Judge Benson. The case did not resolve, and it was returned to Judge Lenihan for further proceedings. (Docket No. 30).

Additional discovery motions followed.[9] (Docket Nos. 32, 34, 37, 38, 39, 41, 48, 49, 50, 57, 60, 69, 75). In all, there were two motions to extend the time to complete discovery. (Docket Nos. 32, 38). The first was joint, and the second was filed by Fisher. (Docket Nos. 32, 38).

Throughout discovery, Judge Lenihan repeatedly reminded counsel of the Local Rules' meet and conferral requirement and the Rules of Professional Conduct.[10] (CM/ECF Text Order June 9, 2011); (Docket No. 55); (CM/ECF Text Order, Feb. 17, 2012) ("It has always been the goal of this court to promote respect and professionalism among attorneys practicing before it and the goal of the Allegheny County Bar Association to promote collegiality among lawyers in the bar. Counsel are again encouraged to attempt to work out these discovery issues in a professional and respectful manner.").

---

[9] The Court comments that the overall length of this litigation was not extraordinary, given the nature of this case. A number of motions were brought for continuances or extensions of time by counsel for both parties. The Court permitted such extensions, in its discretion. *See Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 778 (3d Cir. 2000) (quoting *Fine Antitrust Litig. v. Boise Cascard Corp.*, 685 F.2d 810, 818 (3d Cir. 1983)) ("[W]e will not upset a district court's conduct of discovery procedures absent a demonstration that the court's action made it impossible to obtain crucial evidence.").

[10] Similarly, this Court's Practices and Procedures require that counsel conform in general with the *Code of Trial and Pretrial Conduct*, published by the American College of Trial Lawyers (June 2009). *See also Civil Discovery Standards*, published by the Section of Litigation, American Bar Association (2004). The Court also commends counsel to the *Code of Professional Conduct* published by the Academy of Trial Lawyers of Allegheny County. *See* http://www.atlac.org/images/Guidelines.pdf (last visited Apr. 16, 2015).

### B.     Dispositive Proceedings

Akin to discovery, there were numerous requests for extensions of time during this stage of the litigation. There were some joint motions, but Joyal filed the majority of these requests. (*See* Docket Nos. 6, 11, 78, 88, 104, 115, 146).

Defendants moved for partial judgment on the pleadings, arguing that Plaintiff failed to state a claim for conspiracy and any Equal Protection violation. (Docket No. 65). Additionally, they argued that the Amended Complaint failed to state any claim against the individual Defendants in their official capacities. (*Id.*). During Wise's deposition the next day, Fisher agreed to stipulate that the Equal Protection claim should be dismissed. (Docket No. 81-4 at 1); (Docket No. 81-5 at 181:17-21). The claim was formally conceded two weeks later vis-à-vis the Proposed Order attached to Plaintiff's Response in Opposition to the Motion for Judgment on the Pleadings. (Docket No. 67-1). In the proposed Order and brief, Plaintiff also agreed that punitive damages were not recoverable against the County. (Docket Nos. 67-1, 68 at 3-4). Finally, he asserted that he did not plead a conspiracy claim, despite the following language that appeared twice in his Amended Complaint: "[t]hese Defendants, individually, and in a conspiracy with each other, violated Wise's rights. . . ." (Docket No. 29 at ¶¶ 20, 42); (Docket No. 68 at 7).

After considering the parties' briefs, (Docket Nos. 64, 68), Judge Lenihan issued a Report and Recommendation ("R&R"), (Docket No. 74), which was adopted as the Opinion of this Court, (Docket No. 77). The Motion was granted as it related to any alleged conspiracy claim, Equal Protection Claim and claim for punitive damages against Washington County and the individual Defendants in their official capacities. (*Id.*). It was denied as to the claim for punitive damages against the individual Defendants in their personal capacities. (*Id.*).

Subsequently, Defendants moved for summary judgment, which was opposed. (Docket

Nos. 80, 85). Judge Lenihan ultimately issued an R&R, which was also adopted as the Opinion of this Court. (Docket Nos. 103, 108). All claims against Nixon, Loughman, and Lehr and the assault claim against Kelley were dismissed. (Docket No. 108). The Motion was denied in all other respects. (*Id.*).

Judge Lenihan next convened a final Status Conference. (Docket No. 109). Therein, she raised the possibility of settlement negotiations, but Defendants were not willing to make an offer. (*Id.*). The case was then referred to this Court for trial. (Docket No. 110). A Pretrial Order was entered, setting jury selection and trial for July 10, 2013. (Docket No. 111).

### C. Pretrial Matters

#### 1. Initial Pretrial Proceedings

In light of Joyal's unopposed request for an extension of time to file proposed jury instructions and motions *in limine*, (Docket No. 115), the Court convened a telephonic status conference to reset deadlines and address other pretrial issues, (Docket No. 116). The Court also ordered counsel to submit confidential settlement positions. (*Id.*). After receiving a demand for $1.3 million,[11] Joyal requested a telephonic status conference, during which "Plaintiff['s] counsel was unable to fully account for the demand of $1.3 million made in this case." (Docket Nos. 129, 132, 273-1). Thus, the Court ordered Fisher to provide defense counsel an explanation of the financial basis for his demand.[12] (Docket No. 132).

Two days later, the Court held a final pretrial conference with counsel for both parties in attendance as well as Plaintiff, his wife, and Defendants King and Goroncy.[13] (Docket No. 144).

---

[11] Ordinarily, settlement negotiations are confidential. *See* 28 U.S.C. § 652. However, this figure has been referenced on the public docket since June 2013 over no objection from either party. (Docket Nos. 129, 273-1).

[12] The Court ordered same as there were neither medical bills nor other financial information provided by Fisher at that time to substantiate the demand.

[13] On June 25, 2013, Fisher moved to compel the attendance of the individually-named Defendants at the Pretrial Conference, (Docket No. 137), and the Court granted said Motion, (Docket No. 138). Defendants moved to reconsider, and the Court granted same only to the extent that Kelley did not have to attend due to family

Following same, the Court conducted lengthy settlement negotiations, but the case did not settle.[14] (*Id.*). Given the fact that the trial would likely take more than the week the Court had set aside,[15] Fisher's trial schedule, and a threatened motion to disqualify him, the Court rescheduled the trial for December 9, 2013. (*Id.*); (Docket No. 155 at 161:22).

### 2. Motion to Disqualify Fisher

Defendants argued that Fisher should be disqualified for his failure to return a memorandum[16] inadvertently produced to him as part of a discovery production in *Consonery v. Washington Cnty., et al.*, filed at Civil Action No. 09-1510. Fisher and Joyal were also opposing counsel in that case, which was litigated before now Chief Magistrate Judge Maureen Kelly simultaneously with this matter. This Court ordered both counsel to produce affidavits regarding the alleged inadvertent disclosure. (Docket No. 150).

Previously, in February and March of 2012, Judges Kelly and Lenihan, respectively, directed Joyal to file a motion to claw back the disputed memorandum. (Docket No. 163 at 7); (Docket No. 66). Joyal did not do so. Instead, he set forth argument based on the alleged inadvertent disclosure more than a year and a half later in his Motion to Disqualify Fisher. (Docket No. 163 at 7). Finding this to be an "inexcusable delay," the Court found that Defendants waived the privilege and, accordingly, denied the Motion in this respect. (*Id.*).

Defendants' second argument for disqualification of Fisher was based on his relationship with Melencheck. (Docket No. 157). They argued that he was a potential witness due to Fisher and Melencheck's 2011 correspondence about Wise's seizures and Defendants' treatment of

---

circumstances as outlined in Defendants' Response. (Docket Nos. 140, 141).

[14] *See* Section IV.D., *infra*.

[15] Outside of Kelley, Fisher had not taken any depositions of any of the Defendants or their witnesses. Given same, Joyal argued successfully that trial would likely run more than a week, as it was anticipated that Fisher's cross examination of witnesses would be lengthy. *See* (Docket No. 155 at 146:21-147:5).

[16] The memorandum was sent from King to his counsel, Joyal. (Docket No. 162 at 5:23-24, 14:3-11). In it, King provided information for Joyal to use in answering the Complaint. (Docket No. 162 at 5:23-24, 14:3-11); *see also* Sections IV.2.E. and IV.2.F. *infra*.

same at WCCF. (Docket No. 165 at 3-6). Initially, Fisher sent Melencheck a blank affidavit for him to complete with details about his observations. (*Id.* at 2-3). Fisher then approached Joyal and requested "proper assurances" that inmates who were willing to testify about their observations of the alleged improper treatment of Wise would not "suffer retribution from jail personnel." (*Id.* at 4). In doing so, Fisher arguably was acting as an advocate for Melencheck and Wise contemporaneously. As counsel were unable to agree as to whether this request for assurances was valid, Fisher filed a Motion for Protective Order. (*Id.*). Judge Lenihan granted the Motion to the extent that the identities of potential witnesses would only be disclosed to the WCCF warden and deputies, and that those individuals were prohibited from disclosing the identities to the corrections officers. (*Id.*); (Docket No. 28).

Given the apparent *quid pro quo* relationship between Fisher and Melencheck, Joyal argued that Fisher should not examine Melencheck at trial. (Docket No. 157 at 14). He also claimed that, if the Court would permit same, Fisher would be in a position to testify as to his relationship with Melencheck without being subject to cross examination. (*Id.*). The Court denied the Motion to Disqualify on this basis, but prohibited Fisher from examining Melencheck at trial, leaving Kevin Tucker, Esq. ("Tucker"), his co-counsel, to handle that task. (Docket No. 165).

### 3. Subsequent Pretrial Proceedings

With the matter being set for trial the following week and counsel's failure to agree on joint exhibit binders per this Court's Order, (Docket No. 145), another telephonic status conference took place on December 5, 2013, (Docket No. 176). During same, Fisher informed the Court and defense counsel that he learned the previous day that Wise suffered a seizure earlier that week and remained in critical care. (*Id.*). Accordingly, the Court continued the trial

date from December 9, 2013 to April 7, 2014. (Docket Nos. 180, 181, 182).

In preparation for trial in April, there was yet another Pretrial Status Conference.[17] (Docket No. 186). At that time, the Court denied Fisher's motion for leave to view Melencheck's cell, as fact discovery had been closed for several months. (*Id.*). Plaintiff moved for reconsideration but it was denied as untimely, as this Court requires Motions for Reconsideration to be brought within seven days.[18] (Docket No. 192).

Counsel for the parties engaged in additional pretrial motions practice relative to stipulations, motions *in limine*, and Wise's medical records. (Docket Nos. 205, 210, 224, 227, 233). Given Plaintiff's hospitalization, the Court ordered Fisher to produce his post-incarceration medical records. (Docket No. 191). Fisher moved for an *in camera* review of said records, arguing that they were privileged and unrelated to the instant matter. (Docket No. 196). The Court granted the motion, (Docket No. 199), and issued an Order on several pretrial issues, noting that Defendants had not raised a *Daubert* challenge and the time for same had passed. (Docket No. 197).

Fisher then filed a Motion for a Jury View of WCCF, asserting that Melencheck testified that defense photographs did not accurately portray what he could see from his jail cell. (Docket

---

[17] During said conference, it came to light that Tucker had previously worked for Judge Lenihan as a volunteer law clerk while she presided over this case, and that Defendants were not previously made aware of same. (Docket No. 186). In light of this revelation, Joyal orally moved for reconsideration of the Court's Order adopting Judge Lenihan's R&R on the summary judgment motion. (Docket Nos. 103, 108, 186). Although this motion was denied, as a *de novo* review of the R&R occurred prior to its adoption, this Court is troubled that this fact was not revealed to Defendants earlier in the case. (Docket No. 186). To that end, pursuant to § 310.10(a) of the *Guide to Judiciary Policy*, judicial interns are bound by the Code of Conduct. Under Canon 4.D.3., "[a] judicial employee should ascertain any limitations imposed by the appointing judge or the court on which the appointing judge serves concerning the practice of law by a former judicial employee before the judge or the court and should observe such limitations after leaving such employment." Generally, this Court does not permit appearances for at least a year following service. In this Court's estimation, Tucker and Fisher, as his supervising attorney, had a duty to inform Defendants and the Court about this relationship. *See* Pa. RPC 5.1 ("A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct."). Such notice was not provided until this argument.

[18] Section II.M, Practice and Procedures of Judge Nora Barry Fischer, (eff. Feb. 5, 2013), *available at* http://www.pawd.uscourts.gov/Documents/Judge/fischer_pp.pdf (last visited Apr. 16, 2015).

No. 202 at 3). These photographs had been taken by Martin Murphy ("Murphy"), a professional photographer retained by the defense. (Docket No. 285 at 8). Fisher also argued that the photographs were manipulated. (Docket No. 202 at 3-4). In light of these arguments, Fisher averred that the jury should be able to observe the view from Wise's cell to Melencheck's cell and weigh the pertinent testimony. (*Id.* at 4).

While Defendants did not oppose the Motion, *per se*, they noted WCCF's security procedures and other restrictions that govern such a site visit. (Docket No. 204). In light of said scheduling and security concerns, Fisher withdrew the Motion.[19] (Docket No. 206).

The Court then addressed the use of Wise's February 21, 2012 deposition at trial. (Docket No. 209). Given Wise's continued ill health, Fisher was ordered, at his expense, to begin to undertake the required editing of Wise's deposition taken by Joyal, incorporating the Court's rulings. (*Id.*). Several times in the Order, the Court pointed to *Hall v. Clifton Precision*, 150 F.R.D. 525 (E.D. Pa. 1993) treating deposition conduct, (Docket No. 209), as the transcript was replete with arguments, objections, and unprofessional and often hostile remarks between counsel. (Docket Nos. 81-4, 81-5, *passim*).

Plaintiff moved to exclude reference to Wise's conviction at trial, arguing that its violent nature was highly prejudicial. (Docket No. 205 at 3). The Court ruled, *inter alia*, that it would inform the jury of his conviction for vehicular homicide and issue a limiting instruction. (Docket No. 228). Also, Defendants would be permitted to reference said conviction in their opening statement, but any further reference would be limited, depending on the evidence elicited at trial.

---

[19] The Court points to an email Fisher sent in January 2012, which was attached as an Exhibit to Joyal's Motion for Sanctions, (Docket No. 285):

> Jails are dangerous places and those who visit them are certainly confined behind many locked doors which they cannot control. I will not subject myself to confinement among such dangers for the purposes of a document review that absolutely need not occur in such a wretched place as the WCCF.

(Docket No. 285-1 at 1).

(*Id.*).

Having convened another Telephonic Status Conference upon review of pertinent medical records and treating physician Dr. Karen Tobin's ("Dr. Tobin") medical report, the Court found that Plaintiff was unavailable, as contemplated by Federal Rule of Civil Procedure 32(a)(4)(C), for trial and for a videotaped deposition for use at trial. (Docket Nos. 233, 234, 245). Thus, the Court ordered Fisher to produce a copy of the edited deposition to Defendants and the Court on April 3, 2014, which he did. (Docket No. 234).

Two days later, the Court held another Telephonic Conference, during which Joyal provided an update on the status of the subpoenaed medical records[20] and raised concerns about Plaintiff's ability to prove damages. (Docket No. 240). The Court then heard the parties' positions as to bifurcation before ultimately bifurcating the trial as to liability and damages. (*Id.*).

### D. Trial Proceedings

Jury selection commenced on April 7, 2014. (CM/ECF, Minute Entry, Apr. 7, 2014). That day, Defendants filed a Motion to Dismiss Based Upon Federal Rule of Civil Procedure 36(b), arguing that they were prejudiced as a result of Fisher's disobedience of the Court's discovery Orders and his failure to supplement and/or amend Plaintiff's initial disclosures and responses to interrogatories to include Wise's additional treatment providers. (Docket No. 241). Fisher responded that he had fully complied with the Court's discovery orders and produced all necessary documents to Defendants. (Docket No. 242). The Court heard argument and considered all of the discovery issues throughout pretrial proceedings, up to and including Fisher's failure to comply with the December 13, 2013 Order requiring counsel to secure and provide all medical records created between Wise's release from WCCF and the date of trial.

---

[20] Fisher had recently disclosed records revealing that Wise had been treating with other providers since his release from WCCF. (Docket No. 240 at 2). Joyal had subpoenaed the records as he apparently was unsure if Fisher's production was complete.

(CM/ECF Minute Entry, Apr. 9, 2014). The Court granted the Motion to the extent that it limited Plaintiff's damages claim for emotional/mental distress to his time at WCCF and any immediate hospitalization thereafter.[21] (*Id.*).

Plaintiff presented medical testimony from WCCF physician Dr. John David Six ("Dr. Six")[22] and Wise's treating physician Dr. Tobin, but he did not utilize expert testimony. (Docket No. 251). Following the close of Plaintiff's case-in-chief, Defendants brought a Motion for Judgment as a Matter of Law, arguing that no reasonable jury could find for Plaintiff as to the Eighth Amendment, assault, or battery claims. (Docket No. 244). In their written response to the Motion, Fisher and Tucker maintained that they had met their burden as to all of the claims against all remaining Defendants, pointing to Wise's medical records, WCCF's notes and logbooks, and the testimony of Mr. and Mrs. Wise, Dr. Tobin, Fields, Thomas Wright, Melencheck, and King. (*Id.* at 6-7). However, on April 10, 2014, Fisher voluntarily dismissed all claims against Goroncy, Rossi, and the § 1983 claim against Kelley. (Docket No. 247).

The Court heard oral argument from Joyal, Tucker, and Fisher on April 11, 2014 as to the remaining aspects of the Motion. (CM/ECF Minute Entry Apr. 11, 2014). After the defense rested and the Court heard additional argument on the 14th, the Court dismissed the assault claim against King and the battery claim against Kelley. (Docket No. 251); (Apr. 14 Morning Trans. at 70-72).

Thus, the Eighth Amendment claim against King based on alleged delay and the failure to train and/or supervise claim against Washington County were the only claims remaining when

---

[21] In ruling on this Motion, the Court relied on several Rules of Civil Procedure, including Rule 11, Rule 26(a), (b), (e), (f), Rule 33, Rule 34(b), Rule 37(b), (c), and Rule 41. (CM/ECF Minute Entry, Apr. 9, 2014). The Court explained that Fisher and his client had "not lived up to the rules of discovery, Rule 26, disclosure requirements, the pretrial rulings, and particularly my order of December 13." (Apr. 9, 2014 Trans. at 136:16-25). The Court also pointed out that Wise's medical records repeatedly referenced his long-standing drug and alcohol use. (Apr. 9, 2014 Trans. at 130:20-21).

[22] Dr. Six was an independent contractor who worked at WCCF from 2008 to 2013. (Apr. 9, 2014 Afternoon Trans. at 3:1, 4:25-5:1). He testified that he had neither treated Wise nor met him prior to trial. (*Id.* at 15:9-19).

the case went to the jury. (Docket No. 253). The jury rendered a defense verdict on April 14, 2014, finding that King did not violate Plaintiff's Eighth Amendment right to adequate medical care. (*Id.*). No post-trial motions challenging the verdict were filed.

### E. Motions for Sanctions and/or Attorneys' Fees and Costs

On April 12, 2014, Defendants moved for attorneys' fees and costs under Federal Rules of Civil Procedure 37(b), 37(c)(1)(A), and 26(g) and 28 U.S.C. § 1927 for reimbursement of the costs they spent in securing Wise's subpoenaed medical records, consistent with this Court's prior Order, (Docket No. 187).[23] (Docket Nos. 248, 255). Plaintiff opposed, arguing that the motion was "unfounded, unreasonable, and an improper mechanism for seeking reimbursement" for "fees and costs incurred in the routine course of discovery in this case." (Docket No. 257).

Defendants then moved for an extension of time to file a Motion for Costs and Fees pursuant to 28 U.S.C. § 1927, Federal Rule of Civil Procedure 11, and the Court's inherent authority. (Docket No. 260). The Court granted said Motion, and ordered same to be filed not more than twenty days after the Court ruled on the then-pending Motions. (Docket No. 261).

Plaintiff filed a Sur Reply to Defendants' Motion for Attorney Fees, and attached thereto an Affidavit from Fisher. (Docket No. 262, 262-1). In his Affidavit, Fisher set forth the efforts he made prior to filing the Complaint in this action, his review of the medical records in this case, and his visit with Wise while he was hospitalized on December 5, 2013. (Docket No. 262-1). Tucker also filed an Affidavit explaining his role and exposure to the then-pending Motions before the Court. (Docket No. 263).

On May 28, 2014, the Court convened a Hearing and Oral Argument on Defendants' Motions, (Docket Nos. 248, 255), which was continued, as neither Tucker nor a representative of

---

[23] The Court granted Defendants' Motion to Amend/Correct their Motion for Attorneys Fees and Costs to include argument pertaining to Fed.R.Civ.P. 37(c), as their original Motion erroneously sought sanctions under Rule 36(c). (Docket Nos. 266, 267).

Cohen & Willwerth P.C., Fisher's former firm, appeared, (Docket No. 270). Defendants filed supplemental exhibits demonstrating their costs in subpoenaing Wise's medical records. (Docket No. 272). Fisher filed a Supplemental Affidavit addressing his evaluation of the claim, his fees, and his demand, (Docket No. 273), as well as a Brief arguing that he did not engage in bad faith and that the sanctions sought were inappropriately based on personal animus, (Docket No. 274).

Defendants then filed a Motion requesting that Judge Benson issue a report of his participation in the ENE, providing his opinions as to the strengths and weaknesses of the case. (Docket No. 275). Plaintiff did not oppose same, (Docket No. 276); however, the Court denied the Motion for various reasons outlined in its July 11, 2014 Memorandum Opinion and Order, (Docket No. 284), and discussed, *infra*.

The Court heard additional argument from both counsel at the June 9, 2014 Hearing before ordering Fisher to file evidence concerning his relationship with Cohen & Willwerth. (Docket No. 276). Subsequently, defense counsel and Cohen & Willwerth reached a settlement agreement, and Defendants withdrew the Motions for fees and sanctions on June 30, 2014 in their entirety. (Docket Nos. 282, 283).

However, within the twenty-day time frame set forth in this Court's prior Order, (Docket No. 261), Joyal filed a Motion seeking sanctions against Fisher, only, pursuant to 28 U.S.C. § 1927, Federal Rule of Civil Procedure 11, and 42 U.S.C. § 1988, (Docket No. 285), as well as a Motion for Attorneys' Fees, Expenses and Costs pursuant to 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 54(d), (Docket No. 288). Fisher responded to both Motions, arguing that they were perfunctory in that they did not specify the harm caused by the conduct to be sanctioned or claim the requisite bad faith. (Docket Nos. 289, 290). The Court ordered Fisher to file a supplemental response, as he did not have immediate access to Joyal's billing records, which

were filed under seal in support of his motions. (CM/ECF Text Order, Aug. 5, 2014). Joyal produced the records to Fisher, who then responded, (Docket No. 291), per the Court's Order. Fisher claimed that the records were insufficient proof under § 1988, as they did not denote exactly how much time was spent in defending the alleged frivolous claims and the claims that survived summary judgment but did not reach the jury. (*Id.* at 5-6).

During the Hearing, the Court questioned the timeliness of the Rule 11 Motion, and Joyal immediately responded that he would withdraw the motion.[24] (Docket No. 300 at 4:12-5:6). The Court also encouraged the parties to resolve their dispute, given the nature of the allegations. (*Id.* at 52:9-12). The day after the Hearing, Joyal withdrew the § 1988 motion. (Docket No. 294).

A week later, Fisher filed his pre-filing billing records, under seal. (Docket No. 296). The following day, Defendants filed their Supplemental Brief in support of their Motion for Sanctions, arguing that sanctions were appropriate here because Fisher pursued frivolous claims without any credible evidence to support the damages and liability aspects of the case. (Docket No. 297). In part, Joyal relied on *Zabresky v. Von Schmeling*, discussed *infra*. 2014 WL 2450950, at *9 (M.D. Pa. May 28, 2014); (Docket No. 297). Despite Fisher's billing records being sealed, Joyal referred to them in his brief on the public docket. (Docket No. 297). Hence, the Court removed Joyal's brief from public view. (CM/ECF Text Order Oct. 15, 2014).

Fisher also filed a blank copy of the Akman & Associates Questionnaire. (Docket No. 303-1). Defendants replied, requesting that the Court order Fisher to produce his notes from his November 18, 2010 meeting with Wise and Akman & Associates to confirm that it no longer maintained any files regarding Wise. (Docket No. 304). Fisher responded that he did not have said notes and that no jurisdiction existed over Akman & Associates. (Docket No. 305).

---

[24] The Court discusses same in Section IV.F., *infra*.

A week later, Defendants requested that Fisher produce records from the initiation of the litigation or an appropriate affidavit, (Docket No. 306), which request the Court granted, (Docket No. 307). Fisher then filed an Affidavit stating that, prior to filing the Complaint, he had his initial notes, the Questionnaire, Wise's medical and criminal records, information from WCCF's website, the transcripts of Wise's preliminary hearing and sentencing in the criminal case, and the original file from Wise's criminal attorney. (Docket No. 308). Supporting exhibits were attached to the Affidavit. (*Id.*). In terms of the Amended Complaint, Fisher also had all of the previously-described records as well as the jail records provided by Defendants, their initial disclosures, Melencheck's records, and the ambulance records. (*Id.*). Fisher claimed that he had since lost many of the records during a move. (*Id.*).

Defendants subsequently moved for another Hearing on the Motion for Sanctions. (Docket No. 309). Fisher opposed, (Docket No. 310), and Joyal replied, (Docket No. 314), setting forth the specific evidence he wished to introduce at such a Hearing. Fisher then filed a Sur Reply maintaining that Joyal failed to substantiate Defendants' request for a hearing and questioning whether same was made in good faith. (Docket No. 315 at 2). As the Court believes it has more than a sufficient basis to rule, it denied Defendants' Motion for a Hearing on November 18, 2014. (Docket No. 316).

Given the Court's suggestion to counsel to negotiate their dispute, (Docket No. 300 at 52:11), a Telephonic Status Conference was held on March 12, 2015, during which counsel advised that they had engaged in settlement negotiations. (Docket No. 318). However, negotiations had failed. (*Id.*). Six days later, Fisher emailed the Court's clerk advising that counsel were unable to resolve this matter as they could not agree on confidentiality as a term of any release and settlement agreement.

Based on the Court's inquiry and following email correspondence with counsel and Murphy about Murphy's appearance at trial, Fisher filed an Affidavit about his process in subpoenaing Murphy. (Docket No. 320); *See* Section IV.C.2.e, *supra*. Joyal has not replied to same as of this writing. The Court now turns to the Motion at hand, and writes in support of its Order dated March 31, 2015. (Docket No. 321).

## III. STANDARD OF REVIEW

Title 28 U.S.C. § 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. "Section 1927 is a fee shifting statute which provides that attorneys may be liable for the excess costs, expenses and fees reasonably incurred because of such bad faith conduct." *E.E.O.C. v. U.S. Steel Corp.*, 877 F. Supp. 2d 278, 287 (W.D. Pa. 2012) (citing *Sutton v. American Fed'n of State, County and Mun. Workers, Local 1510*, 1997 WL 34663, at *7 (E.D. Pa. Jan. 28, 1997). Further, "[i]t limits attorney sanctions to situations in which an attorney has '(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct.'" *Ferguson v. Valero Energy Corp.*, 454 F.App'x. 109, 112 (3d Cir. 2011) (quoting *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 101 (3d Cir. 2008)) (internal quotation marks omitted). Indeed, ". . . an attorney's conduct 'must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation.'" *Id.* Interpreting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit explained that a district court may sanction attorneys under its

inherent power when the conduct is egregious or where the statutory provision is inadequate. *Ferguson*, at 114.

The Third Circuit guides that § 1927 sanctions are intended to deter an attorney from intentionally and unnecessarily delaying judicial proceedings, and they are limited to the costs that result from such delay. *LaSalle Nat'l Bank v. First Connecticut Holding Grp., LLC.*, 287 F.3d 279, 288 (3d Cir. 2002) (citing *Zuk v. E. Pa. Psychiatric Inst. of the Med. Coll. of Pa.*, 103 F.3d 294, 297 (3d Cir. 1996)).

To that end, the Court is mindful of the admonition of the Supreme Court of the United States:

> [I]t is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims. . . .

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978). Accordingly, the Third Circuit has held that district courts should impose § 1927 sanctions sparingly. *See In re Orthopedic Bone Screw Products Liab. Litig.*, 193 F.3d 781, 796 (3d Cir. 1999)) (sanctioning powers should be used sparingly in order to avoid chilling novel legal or factual arguments from counsel). It also cautions that, "courts should exercise [this sanctioning power] only in instances of a serious and studied disregard for the orderly process of justice." *LaSalle Nat'l Bank*, at 288-89 (citations and quotations omitted). Further, it notes that the power to sanction under § 1927 necessarily "carries with it the potential for abuse, and therefore the statute should be construed narrowly and with great caution so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law." *Id.* (quoting *Mone v. Commn'r of Intern. Revenue*, 774 F.2d 570, 574 (2d Cir. 1985); *see also Ford v. Temple Hosp.*, 790 F.2d 342, 349 (3d Cir. 1986) ("The uncritical

imposition of attorneys' fees can have an undesirable chilling effect on an attorney's legitimate ethical obligation to represent his client zealously."); *Baker Industr. Inc*, 764 F.2d at 208 ("Th[e] bad faith requirement is . . . necessary to avoid chilling an attorney's legitimate ethical obligation to represent his client zealously[.]"). Prior to sanctioning an attorney, a court must provide the party to be sanctioned with particularized notice of and some opportunity to respond to the charges. *Jones v. Pittsburgh Nat. Corp.*, 899 F.2d 1350, 1357 (3d Cir. 1990).

As such, absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal, the Court may not impose sanctions under § 1927. *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 142 (3d Cir. 2009). A finding of bad faith is required to impose liability; otherwise, "an attorney who might be guilty of no more than a mistake in professional judgment in pursuing a client's goals might be made liable for excess attorneys' fees. . . ." *Baker Indus.*, 764 F.2d at 209; *see also Gaiardo v. Ethyl Corp.*, 835 F.2d 479 (3d Cir. 1987) (holding Section 1927 requires a finding of counsel's bad faith as a precondition to the imposition of fees) (citing *Baker*); *Macheska v. Thomson Learning*, 347 F. Supp. 2d 169, 180 (M.D. Pa. 2004) (citing *Hackman v. Valley Fair*, 932 F.2d 239, 242 (3d Cir. 1991)).

A showing of bad faith requires clear and convincing evidence that counsel or a party intentionally advanced a baseless contention for an improper purpose. *E.E.O.C. v. U.S. Steel Corp.*, 877 F. Supp. 2d at 291–92. Bad faith is plain when the "claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment." *In re Prudential*, 278 F.3d at 188 (quoting S*mith v. Detroit Fed'n of Teachers Local 231, Am. Fed. of Teachers, AFL-CIO*, 829 F.2d 1370, 1375 (6th Cir. 1987)). Bad faith may be inferred where a party pursues clams that are clearly frivolous.

*Johnson v. Smithkline Beecham Corp.*, 2015 WL 1004308, at *7 (E.D. Pa. Mar. 9, 2015) (citing

*In re Prudential*); *see also Matthews v. Freedman*, 128 F.R.D. 194, 206-07 (E.D. Pa. 1989),

*aff'd*, 919 F.2d 135 (3d Cir. 1990) (plaintiff's counsel acted in bad faith by litigating time-barred

claims). On the other hand, bad faith is not found where motions, discovery requests, and

discovery costs are multiplied when they are utilized by counsel to support colorable claims. *See,*

*e.g.*, *Reeves v. Dauphin Cnty.*, 2008 WL 2054006, at *1 (M.D. Pa. May 13, 2008) (citing and

quoting *Mazzone v. Grant Wilfley Casting*, 2008 WL 1803513, at *2 (D.N.J. Apr. 21, 2008)

(citation omitted) and *In re Prudential Ins. Co.*, 278 F.3d at 188).

The Third Circuit has recently affirmed the bad faith requirement in the bankruptcy

context where counsel's bribery tactics, *inter alia*, demonstrated nefarious motives. *In re*

*Prosser*, 777 F.3d 154, 163 (3d Cir. 2015) ("[A]lthough the Bankruptcy Court's reasons for its

finding of bad faith could have been more explicit, its finding was supported by both 'the entire

record' and its use of 'the very words of the statute.'") (citing *Baker Indus.*, 764 F.2d at 209).

Although not controlling, the Court also notes the Ninth Circuit's definition of bad faith:

> A comprehensive definition of "bad faith" or conduct "tantamount
> to bad faith" is not possible, but the type of conduct at issue
> "includes a broad range of willful improper conduct." *Fink v.*
> *Gomez*, 239 F.3d 989, 992 (9th Cir. 2001). Such conduct includes
> "delaying or disrupting the litigation or hampering enforcement of
> a court order." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d
> 644, 648 (9th Cir. 1997). In addition, "willful disobedience of a
> court's order," actions constituting a "fraud" upon the court, or
> actions that defile the "very temple of justice" are sufficient to
> support a bad faith finding. *Chambers v. NASCO, Inc.*, 501 U.S.
> 32, 47 (1991). And "recklessness when combined with an
> additional factor such as frivolousness, harassment, or an improper
> purpose" is sufficient. *Fink*, 239 F.3d at 994. Therefore, "reckless
> misstatements of law and fact, when coupled with an improper
> purpose" can establish bad faith. *Id.*; *see also B.K.B. v. Maui*
> *Police Dept.*, 276 F.3d 1091, 1108 (9th Cir. 2002) (same); *Malhiot*
> *v. S. Cal. Retail Clerks Union*, 735 F.2d 1133, 1138 (9th Cir. 1984)
> (knowing false statements of fact or law establish bad faith). It is

of particular importance to note that it is "permissible to infer bad faith from [a party's] action[s] plus the surrounding circumstances." *Miller v. City of Los Angeles*, 661 F.3d 1024, 1029 (9th Cir. 2011). Accordingly, Mr. Hancock, Mr. Musnuff, and Goodyear [respondents to motion for sanctions] are incorrect when they repeatedly claim the Court must, in effect, obtain a confession before imposing sanctions.

*Haeger v. Goodyear Tire & Rubber Co.*, 906 F. Supp. 2d 938, 974 (D. Ariz. 2012) (alterations in original).

In judging whether an attorney's conduct constitutes bad faith or intentional misconduct, the Court is also mindful of the Pennsylvania Rules of Professional Conduct:[25]

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. . .

> EXPLANATORY COMMENT [1] The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure. The law, both procedural and substantive, establishes the limits within which an advocate may proceed. However, the law is not always clear and never is static. Accordingly, in determining the proper scope of advocacy, account must be taken of the law's ambiguities and potential for change.

> [2] . . . What is required of lawyers, however, is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions. Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail. The action is frivolous, however, if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law.

Pa. RPC 3.1. Pennsylvania courts have explained that Rule 3.1 requires that, where "a lawyer knows that his or her client's case lacks any legal merit, the lawyer is not only justified in

---

[25] Joyal and Fisher presently are both members of the Pennsylvania bar and admitted to practice before the United States District Court for the Western District of Pennsylvania.

refusing to represent the client but also mandated to do so." *Seilhamer v. Pa. Bd. of Prob. & Parole*, 996 A.2d 40, 45 (Pa. Commw. Ct. 2010) (quoting *Peace v. Dept. of Pub. Welfare*, 501 A.2d 1164 (Pa. 1985). In that vein, "[t]here is a presumption that an attorney licensed to practice law in this Commonwealth, who acts as an officer of the court system, has acted in good faith upon signing a document filed with the court." *Eiser v. Brown & Williamson Tobacco Corp.*, 938 A.2d 417, 428 (Pa. 2007) (Baldwin, J., plurality) (citing Rule 3.1).

Rules 3.1 and 3.2, which require attorneys to "make all reasonable efforts to expedite litigation consistent with the interests of the client," go hand-in-hand. Pa. RPC 3.1, 3.2; *see Church of the Overcomer v. Cnty. of Delaware*, 2013 WL 5942378, at *2 (E.D. Pa. Nov. 6, 2013) ("At oral argument and in subsequent communications, in keeping with the highest professional traditions as embodied in Pennsylvania Rules of Professional Conduct 3.1 and 3.2, Plaintiffs' able counsel—admirably acknowledging the significance of the law against his clients' jurisdictional position—has accepted as much").

Rule 2.1 speaks to an attorney's role as advisor: "[i]n representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation." Pa. RPC. 2.1. Indeed, the Third Circuit has noted that "clients employ counsel to assess whether the goals are indeed worth the risks." *Wetzel v. Tucker*, 139 F.3d 380, 386 (3d Cir. 1998) (citing Rule 2.1).

Additionally, relative to the claims before the Court, Rule 1.1 requires that a lawyer provide "competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Pa. RPC 1.1; s*ee also* Pa. RPC 1.1 cmt. 8 ("To maintain the requisite knowledge and skill, a lawyer

should keep abreast of changes in the law and its practice, . . . engage in continuing study and education and comply with all continuing legal education requirements to which the lawyer is subject."). "If one is engaged to represent a client in a matter, one is charged with knowledge of the substantive and procedural law necessary to fulfill that representation." *In re Lashinger*, 1999 WL 409389, at *4 (Bankr. E.D. Pa. June 15, 1999) (citing Rule 1.1).

Moreover, Rule 1.14(a) demands:

> When a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client.

Pa. RPC 1.4(a); *see Com. v. Wesley*, 72 Pa. D. & C.4th 17, 31 (Com. Pl. 2005) (quoting Rule 1.14 and finding that counsel was "obliged to maintain as normal an attorney-client relationship as possible" even though the client was "a young man deep in the thro[e]s of addiction and depression").

## IV. DISCUSSION

### A. Overview of Arguments

Defendants set forth several arguments as to why § 1927 sanctions are warranted against Fisher. (Docket No. 285). They argue that his conduct throughout the course of the suit and trial impugned the reputation of certain defendants who "clearly had no liability under the law" and resulted in extended motions practice, numerous court hearings and the rescheduling of the trial in this matter on three separate occasions. (*Id.* at 5). Their arguments are largely premised upon Fisher's alleged lack of reasonable pre- and post-filing investigation. (*Id.* at 6-9). Specifically, they claim that:

- he should have visited WCCF, noting that his first request to do so was made after discovery had ended, (*Id.* at 9);

- he should have deposed the other Defendants, (*Id.* at 10-11);
- he should have deposed his client ahead of trial, given Wise's seizure history, (*Id.* at 11); and
- he should not have presented the potentially perjured testimony from Melencheck and the allegedly doctored photograph, (*Id.* at 14-15).

In response, Fisher asserts that the § 1927 Motion is perfunctory, as it neither specifies the harm caused by the conduct to be sanctioned nor does it claim the requisite bad faith. (Docket No. 289 at 14) (citing Docket No. 285 at 15) (complaining merely that Fisher "failed to depose witnesses" and "failed to anticipate his client's possible unavailability"). Further, Fisher argues that the Motion fails to provide particularized notice of which defense billing records pertain to their sanctions claims. (*Id.*). To this end, Fisher points out that Joyal had months to research, draft, and satisfy the particularized notice requirements. (*Id.* at 15).

Additionally, Fisher maintains that the motion does not show clear and convincing evidence of his bad faith, because Wise's claims against King and Washington County were submitted to the jury based on Fields' and Melencheck's testimony, the WCCF blue prints and logbooks, and the ambulance records. (*Id.*). Fisher argues that there was no ulterior motive in this case, and that success on the merits was the sole motivation. (*Id.*).

At the September 17, 2014 Hearing, upon questioning by the Court as to what evidence of bad faith he had, Joyal conceded that there was no "smoking gun" here. (Docket No. 300 at 5:22-6:3). Joyal continued by arguing that the claims that ultimately went to the jury were an attempt at retaliation at WCCF officials, nurses, and corrections officers by Wise. (*Id.* at 6:8-10).[26]

---

[26] The Court acknowledges that, in his deposition, Wise testified that nurses Goroncy, Loughman, Rossi, and Nixon did not treat him inhumanely. (Docket No. 81-4 at 5:19-7:9). He also testified that he did not remember what Rossi looked like, (Docket No. 81-5 at 202:1-2), and that he was unaware that Nixon was sued, (Docket No. 81-4 at 74:13-76:2), but that "[i]f she was there for the seizures, then she deserves to be sued." (*Id.* at 77:6-7). Fisher insists that said deposition testimony is attributable to Wise's memory loss. (Docket No. 289 at 12, n.4). Despite Wise's

Joyal also claimed that Fisher engaged in bad faith by keeping certain individual Defendants in this case until the summary judgment stage on claims which, he alleges, were frivolous and unreasonable. (*Id.* at 8:12-17). Further, he reiterated his position that Fisher's conduct relative to the inadvertent disclosure of King's memorandum is itself evidence of bad faith. (*Id.* at 9:10-23). Joyal summarized:

> So, to the extent that the Court asks me to prove bad faith, I can't, again, put into Mr. Fisher's mind or to Mr. Wise's mind a statement or anything such as that that would indicate the requisite bad faith. But I think I can suggest to the Court that if the Court looks at this in the totality of this case, starting from day one, starting from the day when this complaint was drafted and when it was drafted in such a way that there were clearly claims in it that had absolutely no merit and that were either dismissed on a motion for judgment on the pleadings, or conceded to during an initial motion for summary judgment, such as the equal protection claim, and the fact that although there was not a separate count for conspiracy, and at the time of the summary judgment motion and the time of the motion for judgment on the pleadings the argument that came back in response to that from counsel was, that even though there was in the complaint paragraphs that suggested that the defendants conspired to violate Mr. Wise's civil rights, that because -- he didn't really intend to create a free-standing claim for conspiracy, it was sort of, well, it's there, but I didn't ask for a conspiracy claim, so, therefore, there shouldn't be a conspiracy claim. That is part of Judge Lenihan's recommendation to this Court, talked about the issue of there wasn't a claim for conspiracy, even though conspiracy is all over the complaint.
>
> So, to sum up, Your Honor, that I believe is the evidence of bad faith, the actions of counsel from day one up through and including the date that this jury came back with this verdict in the case. And all of the times that this Court had talked to Mr. Fisher and his client about the weaknesses of this case prior to trial, I think that would indicate to me that there is bad faith and this was a bad faith, maybe not to start but as this case progressed, it became a case of bad faith.

(*Id.* at 11:3-12:1).

## B. Standard for Proving a § 1983 Eighth Amendment Deliberate Indifference Claim

---

statements and Joyal's arguments, the Court does not find that Fisher and/or Wise brought this case to punish the Defendants.

Under Supreme Court precedent, a Plaintiff bringing such an action must prove by a preponderance of the evidence that officials showed deliberate indifference to his or her serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Giles v. Kearney*, 571 F.3d 318, 325 (3d Cir. 2009). Here, it was largely conceded that Wise's seizure condition constituted a serious medical need. (Docket No. 103 at 14). Hence, he was required to show that prison or jail officials intentionally denied him access to medical care he requested.[27] *Estelle*, at 104.

Deliberate indifference may be inferred where the prison official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Walter v. Pike County, Pa.*, 544 F.3d 182, 191 (3d Cir. 2008) (quoting *Rouse v. Plantier*, 182 F.3d 192, 196-97 (3d Cir. 1999)). The Third Circuit has also "found 'deliberate indifference' to exist when the prison official persists in a particular course of treatment 'in the face of resultant pain and risk of permanent injury.'" *Rouse*, at 197 (quoting *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990)). "Short of absolute denial, 'if necessary medical treatment is . . . delayed for non-medical reasons, a case of deliberate indifference has been made out.'" *Petrichko v. Kurtz, et al.*, 117 F. Supp. 2d 467, 470 n.3 (E.D. Pa. 2000) (quoting *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)). Expert medical testimony is generally not required in the Third Circuit to prove an Eighth Amendment claim alleging deliberate indifference to a serious medical need. *Id.* at

---

[27] To that end, there are numerous resources available to practitioners who seek to bring such cases in addition to continuing legal education courses directed to § 1983 litigation. In fact, many written sources are available in the Court's library. For example, the American Jurisprudence Proof of Fact's "Elements of Proof" section provides a checklist for proving a violation of an inmate's constitutional rights as well as sample testimony of a plaintiff and an expert witness in such cases. 24 AM. JUR. PROOF OF FACTS 3d 467, § 32 at p. 516. Additionally, the Federal Judicial Center's ("FJC") website provides links to free resources on a variety of topics. www.fjc.gov (last visited Apr. 16, 2015).

473-74 (citing *McCabe v. Prison Health Serv.*, 117 F. Supp. 2d 443 (E.D. Pa. 1997) and *Rizzolo v. Rivas*, 1988 WL 50630 (D.N.J. May 18, 1988).[28]

Medical authorities in prisons are "given considerable latitude in the diagnosis and treatment of medical problems of inmates." *Estien v. Showalter*, 2014 WL 4916333, at *9 (M.D. Pa. Sept. 30, 2014) (citing *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 765 (3d Cir. 1979)). Further, courts will "disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment." *Id.* (citing *Pierce*, at 762). Neither allegations of malpractice nor mere disagreement as to the proper medical treatment support an Eighth Amendment claim. *Lanzaro*, 834 F.2d at 346. Conversely, non-medical authorities are not "chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). In so holding, the Third Circuit reasoned:

> [h]olding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.

*Id.*

## C.  Multiplication of Proceedings in Bad Faith or by Intentional Misconduct[29]

### 1.  Fisher's Duties to Counsel and Investigate

Before and during this litigation, Fisher, as a lawyer and counselor, should have been advising his client in light of the pertinent legal standards for all of his claims. *See* Pa. RPC Rules 1.1,[30] 1.4,[31] 2.1[32]; *In re Mushroom Transp. Co.*, 366 B.R. 414, 441 (Bankr. E.D. Pa. 2007)

---

[28] *See* Section IV.C.2.f., *infra*.
[29] *See* Section III, *supra*, for discussion of standard.
[30] *See* Rule 1.1, Section III, *supra*.

*aff'd sub nom. Burtch v. Ganz*, 405 B.R. 148 (E.D. Pa. 2009), *aff'd sub nom.*, *In re Mushroom Transp. Co.*, 388 F. App'x 204 (3d Cir. 2010) (citing Rule 1.1). Rule 2.1 required Fisher to evaluate the goals of the case versus the attendant risks. *Wetzel*, 139 F.3d at 386, n.4 (citing Rule 2.1). Similarly, Rule 1.4 requires that Fisher "reasonably explain to his client the facts and law necessary" to make an "informed decision regarding his representation." *Meyers v. Sudfeld*, 2007 WL 419182, at *10, n.7 (E.D. Pa. Feb. 2, 2007) (citing Rule 1.4).

Based upon its review of the entire record, the Court queries whether Fisher, consistent with the requirement to render candid advice under Rule 2.1,[33] explained the following to his client:

- There was a chance of losing at trial, especially without an expert;
- Jurors in the Western District of Pennsylvania typically do not award large sums in prisoner cases;
- There was a potential for a § 1988 claim; and
- Qualified immunity may be a complete defense.[34]

Despite what Wise may have perceived as legitimate claims, Fisher should have also recognized the impression that his client could create with the jury. Notably, the very nature of this case permitted the jury to learn that Wise was in jail for vehicular homicide, because he had had a seizure while driving and caused a car accident that killed someone.[35] (Docket No. 228).

---

[31] *See* Rule 1.4, Section III, *supra*.
[32] *See* Rule 2.1, Section III, *supra*.
[33] *Id.*
[34] The Court suggests:
> One helpful tool is to create and print a list of all possible outcomes at the start of representation. Keep the list at the front of the file or binder. Create priorities and update the list with clients and colleagues on a periodic basis. Track the costs to date in a separate column and estimate future fees and expenses. List any indirect costs, such as stress, distraction from the mission of the business and lost opportunity.
> Being open to a variety of options that meet the key interests and goals of clients advances both professional reputation and personal identity.

Robert A. Creo, *Best Practices for Representing Clients*, THE PENNSYLVANIA LAWYER, March/April 2015, at 47.
[35] The Court permitted the jury to hear that Plaintiff was convicted of vehicular manslaughter for several reasons. (Docket No. 228). First, the conviction was relevant for impeachment purposes, as when the trial commenced, it had been only four years since the conviction. (*Id.* at 5). Second, Wise's testimony was "important to establishing his

Given Wise's health conditions, memory problems, and drug and alcohol issues, a prudent attorney would have recognized that his client may have difficulties remembering or reconstructing events and conducted a more thorough investigation and discovery to ensure that there was sufficient evidentiary support for his claims. *See* FED.R.CIV.P. 11(b).[36] For example, Wise was reported as unconscious during the alleged July 16th seizure. (Docket No. 81-4 at 9:19-20). His wife, Melissa Rose Wise, ("Mrs. Wise") testified in her deposition that, when Wise had a seizure, "it takes sometimes a few days, depending on if he has to go to the hospital and the medicines that they give him" for him to remember what happened. (Mrs. Wise Depo. Trx. at 65:1-5). She further explained to the Court during an *in camera* examination that Wise "has serious memory issues." (Docket No. 269 at 19:15).

Accordingly, Fisher needed documents and/or witnesses to bolster Wise's claims. He decided to rely, in part, on the testimony of Melencheck, who had been convicted of tampering

---

claims, and his credibility [was] thus at issue." (*Id.* at 6). The Court next noted that the traffic accident underlying his conviction was not at issue in this suit, so any risk of prejudice to this effect did not require its exclusion. (*Id.*). It also pointed out that the vehicular homicide conviction had probative value, given that the accident was triggered by a seizure, which, to the extent Defendants were aware of same, may have shown their knowledge of Wise's seizure disorder. (*Id.*). In balancing the Federal Rule of Evidence 403 considerations, the Court acknowledged the potential prejudice if said conviction was given too much consideration at trial, but noted that Plaintiff agreed to the admission of joint exhibits which referenced said conviction. (*Id.* at 6-7).

[36] Federal Rule of Civil Procedure 11(b) provides:

> Representations to the Court. By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed **after an inquiry reasonable under the circumstances:**
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) **the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.**

FED.R.CIV.P. 11. (emphasis added).

with jurors.[37] To that end, Defendants argue that Fisher's presentation of allegedly perjured testimony by Melencheck at trial warrants sanctions. (Docket No. 285 at 14-15). In response, Fisher maintains that Defendants have not shown "clear and convincing evidence of bad faith" on the part of counsel, because Plaintiff's claims against King and Washington County were submitted to the jury based on his testimony, the WCCF blue prints and logbooks, ambulance records, and the testimony of Fields. (Docket No. 252-1). This Court agrees.

As noted earlier, there was considerable litigation surrounding Melencheck's credibility. At oral argument on the summary judgment motions, Joyal utilized video[38] and photographs to show that Melencheck could not have seen Wise's seizure. (Docket No. 101). Joyal also introduced photographs at trial to show that Melencheck could not have seen what he claimed. (Docket No. 252). Yet, as Judge Lenhian and this Court opined, there was a jury question as to what Melencheck *heard*. (Docket No. 103 at 16). Indeed, Melencheck's credibility was for the jury to decide. *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 262 (3d Cir. 1987) ("Evaluation of witness credibility is the exclusive function of the jury, and where the only evidence of intent is oral testimony, a jury could always choose to discredit it.").

Obviously, it may not be the best strategy to put a convicted felon, who was in jail because he tampered with jurors,[39] on the witness stand in a jury trial. Fisher should have anticipated that Melencheck's testimony would be subject to a limiting instruction and taken same into consideration when consulting his client.[40] Indeed, the Court instructed the jury on

---

[37] *See Commonwealth v. Melencheck*, CP-63-CR-0001458-2010 (Ct. Comm. Pl. Wash. Cnty.) *available at* https://ujsportal.pacourts.us/DocketSheets/CPReport.ashx?docketNumber=CP-63-CR-0001458-2010 (indicating, *inter alia*, that Melencheck pled guilty to Tampering with Jurors in violation of 42 Pa. C.S. § 4583).

[38] The Court notes the efficacy of such a presentation to the Court. *See Scott v. Harris*, 550 U.S. 372, 387 (2007) (J. Breyer concurring) ("Because watching the video footage of the car chase made a difference to my own view of the case, I suggest that the interested reader take advantage of the link in the Court's opinion, *ante,* at 1775, n. 5, and watch it.")

[39] *See* n.37, *supra*.

[40] *Wetzel*, 139 F.3d at 386 (citing Rule 2.1); *Meyers*, 2007 WL 419182, at *10, n.7 (citing Rule 1.4).

*crimen falsi*, advising them that they could consider evidence that he was convicted of a crime involving dishonesty in deciding whether or not to believe him and how much weight to give his testimony. (Apr. 14, 2014 Afternoon Trans. at 75:17-22). But, Fisher had limited evidentiary support for Wise's claims, because he did not take Wise's deposition for use at trial or discovery depositions of any of the Defendants, other than Kelley. Fields, a fellow inmate, provided some information about the July seizure, recalling that King said that Wise had seized three times on his shift. (Apr. 9, 2014 Morning Trans. 125:21-126:3). He also saw Wise on the stretcher and described his face as blue. (*Id.* at 128:17-19). Melencheck was also willing to testify in more detail. Others, as reported by the investigator, were not.[41] Given these circumstances, the Court does not find Fisher's decision to call him as a witness to have been in bad faith.

Further, Defendants argue that Fisher should have visited WCCF early in the proceedings. (Docket No. 285 at 9). He did not do so before filing the Complaint, the Amended Complaint, or during discovery. *See* discussion at Section II.C.3, *infra*.

Admittedly, Fisher's decision not to investigate the scene in this case is more than puzzling. Consistent with Rules of Professional Conduct 1.1 (Competence) and 3.1 (Meritorious Claims and Contentions), a sensible attorney would have made arrangements to visit the jail prior to filing the action or even after he had deposed Melencheck, especially given the fact that Melencheck had been convicted of a crime which could impugn his credibility.

Similarly, it does not appear that Fisher properly counseled his client as to the attendant risks of this litigation, especially in light of his memory and likely credibility issues. Pa. RPC 2.1 (Advisor). At a minimum, Fisher should have reviewed his client's medical records prior to his deposition, as they demonstrated Wise's drug and alcohol use. (*See, e.g.* Docket No. 308-1 at 3, 7, 14, 15, 30, 34, 35, 42, 44, 45, 48, 50, 51, 54, 55, 56, 58, 60, 61). In fact, courts have found that

---

[41] *See* Section IV.C.2.a, *infra*.

a lawyer "has the right, if not the duty, to prepare a client for a deposition." *Hall*, 150 F.R.D. at 528 (citing Pa. RPC 1.1) Yet, despite this history, Wise specifically denied same during his deposition. (Docket No. 81-4 at 26:17-19) ("Is it in my medical records? No, it's not. I haven't. Like I said, I haven't been doing no drugs."); (*Id.* at 26:15) ("I'm not doing drugs."). Such testimony, which clearly contradicted the written records, likely hurt Wise's case before the jury.

In sum, Fisher exhibited inexperience and bad judgment in failing to properly counsel his client; fully investigate and discover the case, including his failure to make a site visit at the outset; and completely review and understand his client's medical picture. He was left with little choice as to witnesses, based on his investigator's inability to get potential witnesses to talk and his client's inability to appear at trial, except via the edited discovery videotaped deposition. Such facts and circumstances do not equate to bad faith under the statute. Nor has there been a showing of intentional misconduct by Fisher in these regards.

### 2. Fisher's Duty to Support Wise's Claims

### a. Equal Protection Claim

The Equal Protection allegations in the Complaint and Amended Complaint are verbatim and read as follows:

> These Defendants were ignorant, either intentionally or otherwise, regarding their obligations to insure that incarcerated inmates suffering from epilepsy are not punished more harshly that other inmates serving sentences for similar crimes who do not suffer from the immutable trait of an epileptic condition.

(Docket No. 1 at ¶ 40(g)); (Docket No. 29 at ¶ 43(g)). Defendants maintain that Fisher's failure to adequately investigate this case caused him to include this claim, which he could not

support.[42] (Docket Nos. 285, 306 314). They also argue that this failure caused additional expense and delay, burdening Defendants and the Court. (Docket No. 285 at 16).

As set forth above, Defendants moved for judgment on the pleadings on February 20, 2012, arguing that Plaintiff failed to show that there were other inmates with seizure disorders who were provided different medical treatment. (Docket No. 64 at 9). During Wise's deposition the next day, Fisher agreed to withdraw this claim. (Docket No. 81-4 at 1); (Docket No. 81-5 at 181:17-21). Consistent with said concession, Fisher explained in his Response, filed on March 6, 2012:

> In light of continued discovery in this case, it has become evident to Plaintiff that Defendants have created an environment of widespread deliberate indifference to inmates with medical needs, including inmates with propensities to suffer seizures while incarcerated. In light of the widespread nature of this deliberate indifference, Plaintiff now believes he was treated no differently than those similarly situated as himself. Instead, Plaintiff believes all inmates at the Washington County Correctional Facility are subject to Defendants' deliberate indifference with regards to medical care.

(Docket No. 68 at 7).

In this Court's estimation, this claim was weak from the beginning. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (in a "class of one" action a plaintiff must allege that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment"); *see also PG Pub. Co. v. Aichele*, 705 F.3d 91, 114 (3d Cir. 2013) (same). Despite same, Fisher maintains that he filed the Equal Protection claim because of what his client told him: ". . . Mr. Wise believed there had been

---

[42] With rare exception, pre-complaint discovery is not permitted under the Federal Rules of Civil Procedure. *See, e.g. Mixing and Mass Transfer Technologies, LLC v. Lightnin, Inc.*, 2006 WL 140414, at *3, n. 3 (M.D. Pa. 2006). However, Fisher could have filed a request directed at WCCF pursuant to the Freedom of Information Act seeking information regarding, *inter alia*, the incidence of epilepsy and seizure disorders and the medical treatment of inmates. 5 U.S.C. § 552. Unfortunately, he did not.

another person in the jail with a seizure disorder — and this is what I was informed when I filed that equal protection claim — that another person in the jail had had a similar experience as Mr. Wise and was treated better than Mr. Wise." (Docket No. 300 at 20:3-7).

Given these circumstances, the Court finds persuasive its colleague's sentiment in discussing Rule 11 violations:

> Counsel's . . . conduct can be described more accurately as that of an attorney who ignored red flags surrounding the veracity and plausibility of his client's story, lodged allegations without having reasonable belief that they were well-grounded in fact and with evidentiary support, and persisted with a claim that he was unable to obtain evidentiary support for, despite having more than enough time and opportunity.

*Ellis v. Beemiller, Inc.*, 2013 WL 706227, at *3 (W.D. Pa. Feb. 26, 2013). Likewise, other courts have "made clear that '[b]lind reliance on the client is seldom a sufficient inquiry.'" *Brubaker Kitchens, Inc. v. Brown*, 2006 WL 3682180, at *3 (E.D. Pa. Dec. 11, 2006), *aff'd*, 280 F. App'x 174 (3d Cir. 2008) (quoting *Mike Ousley Productions, Inc., et al., v. Cabot*, 130 F.R.D. 155, 158 (S.D. Ga. 1990) and *Southern Leasing Partners, LTD. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986)).

In determining the reasonableness of an attorney's reliance on his client's statements, the Third Circuit has explained that the "shorter the time [that the attorney has to investigate prior to filing the pleading, motion, or other paper], the more reasonable it is for an attorney to rely on the client or forwarding counsel." *CTC Imports & Exports v. Nigerian Petroleum Corp.*, 951 F.2d 573, 579 (3d Cir. 1991). The statute of limitations for a § 1983 claim in Pennsylvania is two years. *Kach v. Hose*, 589 F.3d 626 (3d Cir. 2009) (citing 42 Pa.C.S. § 5524(2)). Here, Wise's third seizure occurred on July 16, 2010 and the Complaint was filed on December 15, 2010.

(Docket No. 1). Thus, it does not appear that any statute of limitations concerns prevented Fisher from further investigating his client's claims.

It is of note that the Pennsylvania Rules of Professional Conduct "do not make clear to what extent the lawyer must investigate to discover the truth." PENNSYLVANIA ETHICS HANDBOOK 197 (Michael L. Temin and Thomas G. Wilkinson, Jr., eds. 2011). However, the lawyer should be mindful of his duty of competency under Rule 1.1, "which requires thorough preparation reasonably necessary for the representation, including inquiry into the facts, and a lawyer's duty in [Rule] 3.1 to refrain from presenting frivolous issues." *Id.* at 197-98. Further, "[c]ompetent handling of a particular matter includes inquiry into, and analysis of, both the factual and the legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners." *Id.* at 34. The lawyer shall also, consistent with Rule 3.2, "make all reasonable efforts to expedite litigation consistent with the interests of the client." Pa. RPC 3.2.

To that end, the Court muses: when the Complaint and the Amended Complaint were filed, did they have support? Fisher's Affidavit claims that he reviewed the file, records and Questionnaire from Akman & Associates, met with Mr. and Mrs. Wise numerous times, and hired an investigator. (Docket No. 273). Yet, as the parties are aware, on February 2, 2012, after the filing of both the Complaint and the Amended Complaint, Fisher emailed Wise various information for his review: jail and medical records; a list of inmates in jail with Plaintiff; initial disclosures; an affidavit; and a log of his efforts to contact cell mates. (Docket No. 273-5). Queries logically follow from this email:

1. Did Fisher have these documents before the date of the email?
2. Did he use them in drafting the Complaints?
3. Had Wise seen these documents before February 2, 2012, the date of the email?

36

4.  What documents or other support, if any, did Fisher have prior
    to filing the initial and Amended Complaints?

The Court also questions why Fisher did not pursue discovery to confirm his client's claim.[43] For example, when his investigator failed to elicit any supporting information,[44] (Docket No. 273 at ¶ 14), he could have turned to other avenues to substantiate this claim such as serving written interrogatories, taking a Rule 30(b)(6) deposition of WCCF, and/or taking the depositions of all of the Defendants and Dr. Six to probe WCCF's handling of inmates with seizure disorders. FED.R.CIV.P. 30(b)(6). *See. Navolio v. Lawrence Cnty.*, 406 F. App'x 619, 623 (3d Cir. 2011) (discussing nurse's testimony that "'a small percentage of people' undergoing detoxification would experience seizures or dizziness due to dehydration"); *see also Imhoff v. Temas*, — F.3d —, 2014 WL 7070721, at *4 (W.D. Pa. Dec. 12, 2014) (denying Defendants' motion to dismiss Plaintiff's deliberate indifference claim based on, *inter alia*, his allegations of seizures during drug withdrawal in the WCCF). The Court also points out that seizures are linked to alcohol and drug withdrawal, both of which are certainly foreseeable in custody. *See, e.g.*, *Detoxification of Chemically Dependent Inmates, Federal Bureau of Prisons, Clinical Practice Guidelines*, 5 (February 2014).[45]

Considering the above facts, Fisher should have conformed his pleadings and/or dismissed the Equal Protection claim in light of the facts that were, or were not, revealed in his

---

[43] *See* FED.R.CIV.P. 11(b), n.36, *supra*; *see also Lawyer Disciplinary Bd. v. Neely*, 528 S.E.2d 468, 473 (W. Va. 1998) ("While we remain concerned about the increasing number of cases that clog our court dockets, we recognize that there are instances where an attorney has exhausted all avenues of pre-suit investigation and needs the tools of discovery to complete factual development of the case. An action or claim is not frivolous if after a reasonable investigation, all the facts have not been first substantiated. A complaint may be filed if evidence is expected to be developed by discovery. A lawyer may not normally be sanctioned for alleging facts in a complaint that are later determined to be untrue.").

[44] In light of the pending Motion, Fisher also submitted his Pre-Filing Billing records, which indicate that he spent a total of 38.6 hours investigating, preparing, filing, and serving the initial Complaint during the period from October 29, 2010 to December 15, 2010, (Docket No. 296). Despite statements that he hired an investigator, there is neither a report from the investigator, Cicchitto, nor billing records referencing same other than a .5 hour entry for a "follow up with the private investigator." (*Id.*). A lone email from Cicchitto, sent on December 3, 2010, reads, "Struggling badly nobody wants to talk." (Docket No. 277).

[45] *Available at* http://www.bop.gov/resources/pdfs/detoxification.pdf (last visited Apr. 16, 2015).

investigation and discovery prior to the February 20, 2012 Motion for Judgment on the Pleadings. Same would have limited the motions practice and thus expedited the litigation. Pa. RPC 3.2. In this vein, courts have found that an attorney acts in bad faith in continuing to pursue a meritless claim. *Johnson v. Smithkline Beecham Corp.*, 2015 WL 1004308, at *13, 14 (E.D. Pa. Mar. 9, 2015) (imposing § 1927 sanctions against plaintiffs' firm that "initiated time-barred cases" causing "Defendants and the Court to expend considerable resources on claims the firm should have agreed to dismiss months earlier than it eventually did"); *Macheska*, 347 F. Supp. 2d at 181 ("By March 1, 2004 however, the underlying suit had been placed in a posture which we believe implicates the sanctions allowed by § 1927. At that point, Jennings clearly knew that his client's case lacked merit. Metaphorically, rather than pulling off of the road or applying the brakes, Jennings allowed his client's vehicle to tumble down a hill towards certain disaster. Sanctions under § 1927 are appropriate to '[D]eter an attorney under from intentionally and unnecessarily delaying judicial proceedings, and they are limited to the costs that result from such delay.'") (quoting *LaSalle Nat'l Bank*, 287 F.3d at 288)); *see also Alphonso v. Pitney Bowes, Inc.*, 356 F. Supp. 2d 442 (D.N.J. 2005) (counsel acted in bad faith in pursuing inflated claim for economic losses and waiting until mid-trial to drop that claim).

Similarly, "even if a lawsuit was initially filed in good faith, sanctions may be imposed on an attorney for all costs and fees incurred after the continuation of the lawsuit which is deemed to be in bad faith." *Loftus v. Se. Pa. Transp. Auth.*, 8 F. Supp. 2d 458, 461 (E.D.Pa. 1998); *Vandeventer v. Wabash Nat'l Corp.* 893 F. Supp. 827, 846 (N.D. Ind. 1995) (citing *Dahnke v. Teamsters Local 695*, 906 F.2d 1192, 1201, n. 6 (7th Cir. 1990) ("In addition, § 1927 has been interpreted to impose a continuing obligation on attorneys to dismiss claims that are no longer viable."). Further, "[R]ule [3.1] is violated if, after assertion of a fact or claim, the lawyer

learns that the assertion has no merit and takes no action to correct the fact or to dismiss the claim or to engage in other remedial conduct." PENNSYLVANIA ETHICS HANDBOOK, 187.

Defendants rightfully brought their Motion for Judgment on the Pleadings, (Docket No. 63), as the "obvious purpose of Rule 12(c) of the Rules of Civil Procedure is to save time and expense in cases wherein the ultimate facts are not in dispute." *Kennedy v. Boles Inv., Inc.*, 2011 WL 2262479, at *5 (S.D. Ala. June 7, 2011) (quoting *Ulen Contracting Corp. v. Tri-Cnty. Elec. Co-op.*, 1 F.R.D. 284, 285 (W.D. Mich. 1940)).

On the other hand, Fisher should have "accept[ed] the facts as they develop[ed]," *Hall*, 150 F.R.D. at 528, and withdrawn the Equal Protection claim once he realized that he had no factual support for same. *Macheska*, 347 F. Supp. 2d at 181. While he may have had a good faith belief in this claim, based on his client's statements at the time of the initial Complaint, sanctions are appropriate here, as Fisher continued to pursue this claim without any basis, causing Defendants to bring their Motion. *See Loftus*, 8 F. Supp. 2d at 461. The Supreme Court has found that, "[f]ee-shifting to recompense a defendant (as to recompense a plaintiff) is not all-or-nothing. A defendant need not show that every claim in a complaint is frivolous to qualify for fees." *Fox v. Vice*, — U.S. —, 131 S. Ct. 2205, 2214 (2011). While the Court in *Fox* was referring to § 1988 costs, the same rationale applies here. Accordingly, no later than April 30, 2015, Defendants shall submit to the Court proof of attorneys fees and costs spent in defending against the Equal Protection Claim.

### b. Punitive Damages Claim

In their initial Answer and the Answer to the Amended Complaint, Defendants correctly maintained that the Defendants in their official capacity and Washington County were not subject to punitive damages. (Docket Nos. 7, 31). To that end, this Court probes Fisher's demand

for punitive damages, despite case law clearly holding that same is not recoverable against the government entity and the individual defendants in their official capacities. *Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981) (holding as a matter of federal law, municipalities cannot be held liable for punitive damages under section 1983); *Smith v. Borough of Dunmore*, 633 F.3d 176, 183 (3d Cir. 2011) (same); *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988) ("Punitive damages cannot be recovered from defendants in their official capacities.").[46]

During the March 2015 Status Conference with counsel, the Court also noted that Fisher had brought a § 1983 case in 2006 before the late Honorable Gary Lancaster in which he did not demand punitive damages in the Complaint or Amended Complaint against the municipality. *Kach v. Hose, et al.*, (W.D. Pa. Civil Action No. 06-1216 Docket Nos. 1, 63). Rule 11[47] imposes a duty to make a reasonable inquiry that his client's claims and other legal contentions were warranted by existing law before he filed his Complaint. Fisher also had a duty to refrain from bringing frivolous claims under Rule of Professional Conduct 3.1.[48] Thus, given these duties, his prior litigation, and long-standing Supreme Court and Third Circuit precedent, when he brought this suit, Fisher knew or should have known that punitive damages were not recoverable against the County and the individual defendants in their official capacities.

Here, the punitive damages claims were disposed of upon Motion for Judgment on the Pleadings. (Docket No. 77). Yet, given long settled law, these punitive damages claims should not have been brought nor pursued. Hence, § 1927 sanctions are appropriate to the extent

---

[46] With regard to Defendants in their individual capacities, it has long been recognized that "individual public officers [are] liable for punitive damages for their misconduct on the same basis as other individual defendants." *Smith v. Wade,* 461 U.S. 30, 35 (1983). In order to qualify for a punitive damages award, "the defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard." *Savarese v. Agriss,* 883 F.2d 1194, 1204 (3rd Cir. 1989).

[47] *See* n.36, *supra*

[48] *See* p. 22, *supra*.

Defendants incurred costs and fees defending against same. Once again, Defendants are required to submit supporting documentation by April 30, 2015.

### c. Plaintiff's Deposition

As all parties, litigants, witnesses, and personnel associated with this case are more than familiar, Wise had a seizure on December 3, 2013 when this matter was set for trial on December 9, 2013. (Docket Nos. 176, 180, 181, 182). The Court continued the trial to April 2014 and subsequently found Wise to be unavailable for trial or for a deposition for use at trial. (Docket Nos. 181, 235). Accordingly, Fisher was left to rely on his client's February 21, 2012 deposition. (Docket No. 235); FED.R.CIV.P. 32.

After the June 26, 2013 Pretrial and Settlement Conference, wherein Wise was visibly distressed, Fisher should have anticipated that his client could encounter difficulties at trial. Fisher's duty to the Court included assessment of his client's physical and mental conditions and their potential effects on this litigation. *See* Pa. RPC Rules 1.1, 1.14.[49] It also required him to keep the Court and opposing counsel apprised of any changes in Wise's health and to make all reasonable efforts to expedite litigation. Pa. RPC Rule 1.4, 3.2. Thus, the delay which occurred in December 2013 may have been avoided if counsel had taken Plaintiff's deposition for use at trial shortly after the Pretrial and Settlement Conference.

Yet, Fisher did not edit Wise's videotaped deposition for use at trial prior to the December 7, 2013 trial date, despite Wise's condition. (Docket No. 285 at 11). After the trial was continued, the Court ordered counsel to meet, confer and submit a joint status report as to the objections contained in Wise's discovery deposition. (Docket No. 181). While counsel for both parties submitted delineated objections, (Docket No. 185), as Defendants point out, the real burden largely fell on the Court and her law clerk who spent considerable time making

---

[49] *See* p. 24, *supra*.

significant edits and supporting line-by-line rulings on the transcript before it could be presented to the jury. Thereafter, the Court ordered Fisher to edit the videotaped deposition per the Court's rulings for use at trial at Plaintiff's expense. (Docket No. 209).

In response to the present Motion, Fisher noted that he did not undertake the editing earlier, because "it would have required Attorney Joyal's participation which Attorney Joyal never offered." (Docket No. 289 at 12). Despite same, a conscientious attorney would have undertaken this task much earlier to avoid delay and inconvenience to the Court. Notwithstanding the Court's criticism, Fisher did not engage in bad faith in this context. Instead, he once again demonstrated his inexperience and poor judgment.

Before moving on, this Court would be remiss if it did not address counsel's conduct during Wise's deposition. Therein, Joyal exhibited an aggressive and at times antagonistic tone in questioning Wise while Fisher made repeated speaking objections:

> Q [by Mr. Joyal]: How did you know where to contact him [Melencheck] after you got out of jail so that he could do the affidavit that he gave to Mr. Fisher?
> Mr. Fisher: Objection. That assumes facts in evidence. Mr. Melencheck contacted me unsolicitedly [sic], and you know that, because I provided you a copy of the letter he sent to me unsolicitedly [sic].
> Mr. Joyal: I'm going to move to strike that because you're not under oath, Mr. Fisher. I asked your client a question, and he could have answered it by saying he didn't. I didn't need you to tell us anything on the record that was not sworn testimony.
> Mr. Fisher: If you didn't ask misleading questions, you wouldn't have these objections from me.
> Mr. Joyal: Okay. Mr. Fisher, the question was, how did you know where to contact Mr. Melencheck.
> Mr. Fisher: And there's no facts in evidence that he contacted Mr. Melencheck, because he did not. So you're asking a misleading question.
> Mr. Joyal: All he needed to say, sir, was I didn't.
> Mr. Fisher: All you needed to do was not ask a misleading question.
> Mr. Joyal: I'm not going to argue with you. All right.

(Docket No. 81-4 at 42:3-43:7). In this vein, the Court once again points to the guidance of the late Judge Robert S. Gawthrop:

> . . .objections and colloquy by lawyers tend to disrupt the question-and-answer rhythm of a deposition and obstruct the witness's testimony. Since most objections, such as those grounded on relevance or materiality, are preserved for trial, they need not be made. As for those few objections which would be waived if not made immediately, they should be stated pithily. *See*, Fed.R.Civ.P. 32(d)(3).

*Hall*, 150 F.R.D. at 530.

Joyal also frequently interrupted Wise and asked repetitive questions. A sample follows:

Q [by Mr. Joyal]: Okay. Which condition are you talking about when he [Captain King] was doing all the laughing?
Mr. Fisher: He already testified about the condition he was talking about.
Q [by Mr. Joyal]: Is that the seizure?
A [Plaintiff]: Laying there in a puddle of shit and piss.
Q: That's the seizure?
A: That's not right.
Q: Is that the seizure that you were talking about when he was doing all that?
A: Any situation.
Q: Well, I'm asking you specifically to your case. Is it the seizure?
Mr. Fisher: He has asked and answered that question hours ago.
Mr. Joyal: That's right.
Q: [by Mr. Joyal]: Is it the seizure?
A [Plaintiff]: And you're still drilling me about both situations.
Q: How about you just answer my question.
A: I already answered your question. I ain't got time to sit here with you all day and go over the same thing, same crap, same situation —
Q: Sir, you'll be here for the seven hours that I have you for under the rules.

(Docket No. 81-4 at 106:6-107:12). In this context, the Court points to a recent article providing deposition advice:

> Whether you are dealing with a difficult witness or opposing attorney, it is important to remain calm and in control. While this can be difficult during a heated exchange, there is no quicker way to lose control of a deposition than to engage in a verbal sparring

session with an opponent. . . When disagreements do occur, it is always wise to take the high road rather than engaging an opposing counsel or party.

Brad E. Haas, *Deposition Tips for Earning Respect as a Young Attorney*, THE LEGAL INTELLIGENCER, Mar. 12, 2015.[50] The Court will further address both counsel's conduct later in this opinion.

### d. Failure to Depose and Dismiss Individual Defendants

As further support for their argument that this case was brought in bad faith, Defendants argue that the claims against the nurses should not have been pursued. (Docket No. 285 at 11-12). To that end, Defendants highlight that Fisher did not depose all of the individual Defendants. (*Id.* at 10). As the Court has already set forth, some of the claims against the nurses and corrections officers were dismissed at the time of summary judgment proceedings. (Docket No. 108) (dismissing claims against Nixon, Loughman, and Lehr). Others were dismissed at trial. (Docket No. 247).

At the Sanctions Hearing, Joyal questioned Fisher's motives to "press forward" with claims against the individual Defendants and argued that *Zabresky v. Von Schmeling* provided guidance.[51] 2014 WL 2450950, at *9 (M.D. Pa. May 28, 2014); (Docket No. 300 at 7-10). Therein, Judge Mannion found that the Plaintiff was "out to punish his ex-wife" and awarded § 1988 sanctions, holding:

> Even if Mr. Zabresky did not understand the intricacies of the law, his attorney should have. After all, he is an officer of the court and a member of the Pennsylvania Bar and the Bar for the U.S. District Court for the Middle District of Pennsylvania. He took an oath to uphold the high legal standards and ethical requirements required

---

[50] *Available at* http://www.thelegalintelligencer.com/id=1202720323187?keywords=deposition+conduct&publication=The+Legal+Intelligencer (last visited Apr. 16, 2015).

[51] The present case is distinguishable from *Zabresky* in that the Court did not find the entirety of this case to lack merit. Nor did this Court find this case to have been brought to punish Defendants. *See* n.26, *supra*.

> by both of those esteemed institutions. It is clear Mr. Zabresky has an emotional tie to this case. Regardless of the plaintiff's personal passions or beliefs, he and his attorney had a duty to pursue claims that have earnest factual and legal support. In this case, his claims were devoid of legal or factual basis. The court finds they were so lacking that it is compelled to award attorney fees to the defendants.

*Id.* Wise, like Zabresky, is not expected to know the intricacies of the law. Fisher, as an attorney, however, took an oath to uphold the legal and ethical requirements of both the Commonwealth of Pennsylvania and the United States District Court for the Western District of Pennsylvania. *Id.* He was thus required to pursue claims with legal and factual support. *Id.*

The Complaint and Amended Complaint alleged that Defendants' lack of or improper treatment caused him injury, (Docket No. 1 at ¶¶ 13, 17-19); (Docket No. 29 at ¶¶ 20-22). Wise explained in his deposition his claims are not for medical negligence; instead, they revolve around the alleged inhumane treatment he received at WCCF. (Docket No. 81-5 at 126:4-23). Ordinarily, unlike a medical negligence case, expert medical testimony is not required to prove causation of such injuries in a § 1983 case. *McCabe*, 117 F. Supp. 2d 443. However, as will be discussed further, *infra*,[52] to prove the worsening of Wise's condition, expert medical testimony likely was required to prevail at trial. *Petrichko*, 117 F. Supp. 2d at 474, n.7.

Fisher had little evidence to prove the nurses' culpability, given that:

- he never took the depositions of these Defendants;
- his client was unconscious during the seizures and exhibited memory issues;
- his client could not readily distinguish the nurses involved in his case;[53]
- one of his witnesses to the seizures was Melencheck, who had attendant credibility issues;
- he did not have an expert as to the jail's procedures for inmates with seizure disorders or the nurses' protocols in treating seizures; and
- he did not have an expert to testify that Wise's seizure condition worsened during or after his incarceration at WCCF.

---

[52] *See* Section IV.C.2.f, *infra*.
[53] *See* n.26, *supra*.

Despite same, the Court does not find that it was improper for Fisher to keep the remaining nurse Defendants in the case through his case-in-chief. Fisher's theory was that Defendants exposed Wise to "great harm" in delaying necessary medical care and repeatedly assaulting and battering him. (Apr. 8, 2014 Morn. Trans. at 21:24-22:7). In his opening, Fisher noted Defendants' alleged inability to provide Wise with oxygen and pointed to WCCF logbooks showing that Defendants waited at least fifteen minutes to call an ambulance. (*Id.* at 23:1-24:10). He submitted that such delay and Defendants' mocking and taunting Wise demonstrated that they intentionally "turned a blind eye" to Wise's serious medical needs. (*Id.* at 24:5-10). As further evidence of their deliberate indifference, Fisher argued that Defendants accused Wise of faking his seizures. (*Id.* at 24:23-25:1). In his closing, Mr. Fisher reiterated these points and reminded the jury that this case was about inhumane treatment, not malpractice. (Apr. 14, 2014 Trans. at 45-64).

Even without expert testimony as to the worsening of Wise's condition and/or the appropriate standard of care for such an Eighth Amendment claim, the jury did consider the fairly legible handwritten notes from WCCF nurses and corrections officers, which were presented at trial as Joint Exhibits 1 and 5. (Docket No. 252); (*see also* Docket No. 308-3 at 43, 54, 57, 59, 60 61, 63, 64, 65, 69, 70, 71, 73, 74, 75, 80, 82). These notes describe Wise's medical treatment in the jail on the following dates in 2010: May 1, 15, 26, 27, 28, 29; June 3; July 15, 16, 17, 18, and 19. (*Id.*). Specifically, Loughman's report details Wise's May 15, 2010 seizure for which he was taken to the hospital and Goroncy's follow-up call to the hospital two days later. (Docket No. 308-3 at 80). They also detail the July 16th seizure. (*Id.* at 82).

Further, Dr. Six, in his trial testimony, described his role as one of the WCCF's physicians, and testified about the nurses' notes. Dr. Tobin, who had treated Wise for his seizure

disorder for approximately fifteen years, likewise testified about the WCCF treatment notes and Wise's medical records concerning the seizures he allegedly suffered in WCCF. (Apr. 10, 2014 Trans. at 24:22-25:4). And, both physicians were credible witnesses, in this Court's judgment.

As to delay in treatment, Wise testified in his deposition, the video of which was played at trial, that Defendants should have called an ambulance right away, because "if somebody's in a seizure three to five minutes, that's too damn long."[54] (Docket No. 81-5 at 179:3-8). Fields testified about the July seizure and claimed that approximately twenty minutes or a half hour passed from the time when Wise's seizure began until the emergency personnel left with Wise on the stretcher. (Apr. 9, 2014 Morning Trans. at 125:2-6, 129:18-21). As noted earlier, Fields saw Wise leave with a blue face. (*Id.* at 128:17-19). Melencheck likewise testified that Wise had a blue face, there was delay in getting the oxygen tanks; Rossi had suggested Wise was faking the seizure; King and other male personnel were mocking Wise; and, it took between thirty-five and forty-five minutes for King to call 9-1-1. (Apr. 9, 2014 Afternoon Trans. at 52:23-53:1, 56:5-24, 59:1-60:15).

It would have been more prudent for Fisher to have deposed the nurse Defendants or examined them at trial, as he indicated he would. However, his failure to do so does not support a finding of intentional misconduct or bad faith. Again, the nurses' notes were jointly admitted, and the jurors had the benefit of said notes in their deliberation, along with the testimony outlined above. Fisher's delay in treatment theory was supported by testimony concerning delay in providing oxygen and in calling 9-1-1; the time it took for the ambulance to arrive; and, alleged mocking and taunting before Wise's July seizure was addressed. Along with the medical testimony of Drs. Six and Tobin, the jury could have found that the remaining nurse Defendants

---

[54] Mrs. Wise testified in her deposition that, when Mr. Wise had seizures, she would call an ambulance if it lasted longer than five minutes based on what she learned by talking to doctors and researching on the internet. (Apr. 8, 2014 Trans. at 7:18-8:21).

were deliberately indifferent to Wise's seizure condition vis-à-vis delay or lack of treatment in regard to this seizure.

Yet, Fisher voluntarily dismissed nurses Goroncy and Rossi following Plaintiff's case.[55] (Docket No. 247). He maintains that "[i]t was only in assessing the jury's reactions to all of the evidence presented in Plaintiff's case that Plaintiff relied on the suggestion of his wife and mother-in-law that the claims against both nurses be dismissed as a tactical matter."[56] (Docket No. 289 at 12); *see also IMX, Inc. v. Lending Tree, LLC*, 469 F. Supp. 2d 203, 223 (D. Del. 2007) (finding that "defendant's trial tactics did not rise to the level of bad faith or vexatious litigation" although the court had found defendant's legal arguments unconvincing and previously rectified its "not necessarily exemplary litigation conduct").

The Court accepts that Fisher's explanation that his decision to keep Gornocy and Rossi in the case was strategic. Notwithstanding any delay or inconvenience attributed to said decision, *see* Pa. RPC 3.2 (Expediting Litigation), his conduct does not amount to bad faith under § 1927. *See* Section III, *supra.*

### e. Subpoena of Murphy

Defendants argue that Fisher improperly subpoenaed Murphy, the defense photographer, and did not pay him an appropriate witness fee. (Docket No. 285 at 9). Indeed, the subpoena was insufficient, as it was not signed by a process server. (Apr. 8, 2014 Morning Trans. at 6:7-12). It is basic trial practice that any competent attorney should effectuate service of a subpoena properly. Pa. RPC 1.1 (Competence). Yet, upon receipt of said subpoena, Murphy (who had

---

[55] As they were named Defendants, they were required to be present during the Pretrial Conference and the trial. (*See* Docket No. 111 at ¶ 2); Section III.A.2, Practices and Procedures of Judge Nora Barry Fischer, *supra* n. 18. They likely missed work and were otherwise inconvenienced. Further, Washington County may have had to replace them for shift work at the jail while they were in trial.

[56] Mrs. Wise and her mother were present throughout the trial. Apparently, they felt the trial was not going well and they must have relayed that impression to Wise. Perhaps, they sensed some empathy from the jurors for the nurse Defendants as they sat through the trial.

previously appeared in Court) should have recognized that it was insufficient or called Fisher or Joyal to confirm his appearance. Nevertheless, Murphy appeared on the morning of April 8, 2014 and advised that he had a conflict with his schedule and would need to leave by 3:00 p.m. (*Id.* at 8:6-13). The Court responded that, based on Fisher's representations to the Court, Plaintiff's first two witnesses would be Mrs. Wise and King. (Apr. 7, 2014 Afternoon Trans. at 52:17-20). Given that jury selection had not concluded, both parties had to provide opening statements, and two witnesses had to be called prior to Murphy, it was unreasonable that Fisher did not inform Murphy that his attendance was not needed at the time and date on the subpoena.

Based on Defendants' contention that Fisher did not pay Murphy the requisite witness fee, this Court inquired by email to both counsel and Murphy on March 23, 2015 whether Murphy was paid for his appearance, and if so, by whom. As counsel and Murphy provided conflicting responses, Fisher was ordered to file an Affidavit.[57] (Docket No. 319). The Affidavit claims that Murphy received a subpoena and check for $41.13 on December 4, 2013. (Docket No. 320 at ¶ 2).[58] When the trial was continued to April 2014, Fisher informed Murphy that he should destroy the check. (*Id.* at ¶ 7). Murphy had already deposited the check, so Fisher informed him that he should apply said funds toward the future subpoena likely to be issued for his appearance at the rescheduled trial. (*Id.* at ¶¶ 8, 9).

In all, Fisher should have served the subpoena properly and communicated with Murphy, as it was clear that he did not keep him abreast of the trial's progress.[59] Failing to do so not only wasted Murphy's time, but it also wasted the Court's time and resources as it delayed the start of

---

[57] To date, Joyal has not responded to this Affidavit.

[58] The Court is chagrined that this Affidavit also contained facts which were not presented to the Court on the morning of April 8, 2014, when this issue arose. (Docket No. 320).

[59] The Court finds it to be common courtesy for attorneys to keep their witnesses apprised of the proceedings. Here, Fisher was not trying this case alone, and he could have delegated the task of keeping the witnesses updated to his associate, Tucker.

the trial. Once again, Fisher's bumbling does not amount to bad faith. The Court also notes that Joyal had listed Murphy as a defense witness, but ultimately he did not testify. (Docket No. 142 at 2).

### f.   Plaintiff's Lack of Expert Testimony

Defendants argue that Fisher should have corroborated his client's claims with liability and damages experts. (Docket No. 285 at 7). Fisher did not directly respond to this argument; instead, he maintains that, because the case went to the jury, it had merit.[60] (Docket No. 300 at 46:1-6). In his opening, Fisher submitted that he would prove that WCCF policy and procedure provides that "emergency medical treatment should have been provided as soon as possible" but that "defendants did not take immediate action" and delayed such treatment "for nonmedical reasons because they thought he [Wise] was faking it." (Apr. 8, 2014 Trans. at 25:8-11, 25:20-25). In his case-in-chief, instead of using expert witness testimony to speak to jail standards, policy, and procedures as to medical treatment of inmates, Fisher and his client stated they would rely, in part, on the "Red Cross Skills Card." (Docket No. 135 at 3-4). Indeed, at trial, Fisher attempted to use this card in his direct examination of King. (Apr. 8, 2014 Afternoon Trans. at 61-64).

Fisher called King, who testified about Wise's May 15th and July 16th seizures, the alleged May 26th seizure, the emergency services training he received at WCCF, the logbooks, the Red Cross skills card, the nurses' response to emergency situations, and Wise's discipline at the jail.[61] (*Id.* at 48-103). He also put on medical testimony through Drs. Six and Tobin. (Docket

---

[60] He did not utilize expert testimony here, whereas he did use a dental expert witness in the *Consonery* case, for which his client received a verdict against WCCF. (Civil Action No. 09-1510).

[61] The Court pointed out during the Rule 50 argument, (Apr. 11, 2014 Trans. at 30-32), that the law of the Third Circuit is such that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill*, 372 F.3d at 236; *see also Barkes v. First*

No. 251). Fisher had listed a Red Cross representative as a witness who would testify as to the import of the card, which was produced by Defendants in discovery. (Docket No. 135 at 3-4); (Docket No. 172 at ¶ 4). Later, he identified Phyllis Moore ("Ms. Moore") as the Red Cross representative who would speak to the card, but he did not call her at trial.[62] (Docket No. 251).

As noted above, Plaintiff bears the burden of proving that the Defendants did not provide him with adequate treatment. *Estelle*, 429 U.S. at 106; *see also Colburn v. Upper Darby Township*, 946 F.2d 1017, 1030 (3d Cir. 1991). ("A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred.").

While the case law in this Circuit is less than precise, it is clear that a Plaintiff may prove deliberate indifference to a serious medical need without presenting expert testimony if "the seriousness of the injury or illness would be apparent to a lay person."[63] *Boring v. Kozakiewicz*, 833 F.2d 468, 473 (3d Cir. 1987); *Petrichko*, 117 F. Supp. 2d at 473-74 n.7 (noting that plaintiff did not need to produce expert testimony at the summary judgment stage). Here, there was no debate that Wise is an epileptic with a history of seizures and that epilepsy is a serious medical need. Because this case was bifurcated, the jury only had to address whether the Defendants

---

*Correctional Medical, Inc.*, 766 F.3d 307, 327 (3d Cir. 2014). The Court also noted that Fisher did not take any of the depositions of WCCF's policymakers.

[62] Joyal was within his rights to ask for leave to depose her, even though discovery had ended. (Docket No. 171). Fisher and Joyal confirmed via email in March 2015 that this deposition did not occur.

[63] Similarly, other circuits do not require expert testimony in such cases. *See Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("We have never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony. The inquiry remains whether the treating physician or other prison official was deliberately indifferent to a prisoner's serious medical needs, not whether the doctor's conduct is actionable under state malpractice law. Expert testimony certainly could have bolstered Hathaway's case at trial, but the absence of such expert proof does not mandate dismissal of his action where the facts support a finding of deliberate indifference."); *Ledford v. Sullivan*, 105 F.3d 354, 359 (7th Cir. 1997) ("Because the test for deliberate indifference is more closely akin to criminal law than to tort law, the question of whether the prison officials displayed deliberate indifference toward Ledford's serious medical needs did not demand that the jury consider probing, complex questions concerning medical diagnosis and judgment.").

were deliberately indifferent in their allegedly delaying treatment. As such, expert testimony was not needed during the liability phase.

However, expert testimony would have been necessary to demonstrate Defendants' deliberate indifference caused Wise's condition to worsen. As discussed, *supra*, and explained in *Petrichko*, to show that a delay in treatment in fact caused a plaintiff's injury, that plaintiff would need to produce expert medical testimony to prevail at trial. *Id.* at 474, n.7. To that end, the Court also notes a case which likewise centered on treatment of seizures. In *Boomer v. Lewis*, the Middle District of Pennsylvania found that, without expert testimony, a reasonable juror could not conclude that certain medical defendants were deliberately indifferent to plaintiff's seizure disorder for the alleged eleven-month delay in medical treatment. 2009 WL 2900779, at *11 (M.D. Pa. Apr. 1, 2009).[64]

Likewise, expert testimony was required to prove "any serious deterioration" in an inmate's heart condition or immune system. *Montgomery v. Pinchak*, 294 F.3d 492, 504 (3d Cir. 2002). The Circuit has also upheld the trial court's finding that expert testimony was required to prove "the seriousness of the medical consequences and effects of MRSA [methicillin-resistant staphylococcus aureus] and foot ulcers" because "the ability to diagnose a foot infection and determine the proper treatment and medication protocol is not readily apparent to lay persons." *Mitchell v. Gershen*, 466 F. App'x. 84, 87 (3d Cir. 2011) (affirming grant of summary judgment). It further has held that expert testimony was required for an inmate to prove that the forced administration of antipsychotic medication constituted deliberate indifference to his medical needs. *Aruanno v. Glazman*, 316 F. App'x 194, 196 (3d Cir. 2009); *see also Paith v. Cnty. of Washington*, 394 F. App'x. 858, 860 (3d Cir. 2010) ("Whether a medication is ineffective if it is given without food is not readily apparent to a lay person.").

---

[64] This case resulted in a jury verdict for the defense.

Given these holdings, in this Court's estimation, it would have been better practice for Fisher to use one or more expert witnesses to support his client's claims that his condition worsened.[65] For example, he could have elicited a report from Dr. Tobin consistent with Rule 26 and used her both as a treater and an expert. FED.R.CIV.P. 26. However, Fisher did not put on such expert testimony, and, after his case-in-chief, he dismissed all but one of the remaining individual Defendants, causing only the Eighth Amendment claim against King and Washington County to go to the jury. (Docket No. 253).

As discussed earlier, Fisher asserts that his decision to dismiss the remaining nurses was based on conferral with his client and his family, during which they expressed concerns about the impression that was being made with the jury.[66] The Court accepts this rationale and acknowledges that other factors, such as availability and costs, may have played a part in his decision whether to hire an expert or not. Considering all of the above, Fisher's failure to hire an expert does not amount to bad faith. Rather, it is indicative of poor strategy or judgment. To the

---

[65] Once again, there are countless sources available to Fisher on this issue. *See also* COLUM.HUM.RTS.L.REV., *A Jailhouse Lawyer's Manual*, Ch. 23, p. 32 (8th ed. 2009) ("The most common method of proving that a defendant breached a duty is to have an expert provide testimony that the defendant did not use the usually accepted procedures."). The Court finds informative the following excerpt from the Illinois Legal Aid's Federal Court Prison Litigation Project Handbook:

> It is also suggested that counsel approach this type of case like a medical negligence case with the understanding that much more is required in an Eighth Amendment action (that is, a subjective state of mind that indicates deliberate indifference). First, do research in medical textbooks for lawyers at local law schools (John Marshall Law School has the necessary materials) or local medical schools to learn the basic terminology and nature of care for the type of injury and treatment involved. Then have a qualified physician (See Statutory Authority for Awarding Attorneys' Costs and Fees) review the medical records, the client and witness statements, depositions, etc., to determine if there has been, at the very least, a deviation from the accepted standard of care required of physicians, hospitals, or other medical providers in the situation in which the client is involved.
>
> If you can meet the "negligence" standard, then move to the deliberate indifference level. Again, your expert and medical treatises may establish that the client's condition was serious and the treatment needed was obvious to any practitioner or even a lay person; hence, the failure to treat the serious medical needs of the client was deliberate.

Illinois Legal Aid, *Federal Court Prison litigation Project Handbook Part II*.

[66] *See* n.56, *supra*.

extent that the individual Defendants were inconvenienced in having to appear at the Pretrial/Settlement Conference and trial, same is required of named Defendants in all cases before this Court, as discussed earlier.[67]

### D. Fisher's Evaluation of the Case and Settlement Negotiations

The Court now examines Fisher's conduct relative to his view of the merits and value of this case throughout the litigation. Joyal argued that Plaintiff's demand was "outrageous" and "without any thought process whatsoever of a value." (Docket No. 300 at 10:4-5). He further contended that, since the demand included a six-figure attorney fee claim that:

> A, had not been proven, and, B, if indeed they were generated, were generated by the fact that there was a continued prosecution of a case which had absolutely legally enough deficiencies to put any reasonable lawyer on notice that the case should either be withdrawn or settled for a very reasonable amount of money.

(*Id.* at 10:21-11:1).

Fisher responded that he extensively relied on the materials from Akman & Associates, interviewed Wise and his wife, and hired a private investigator to support Wise's claims. (*Id.* at 13:4-14). In an Affidavit, Fisher claimed that his demand was mindful of other jury awards in prisoner cases.[68] (Docket No. 273 at ¶ 10). He further argued that Joyal "admitted on the record that he never had any intention of settling the case."[69] (Docket No. 300 at 16:14-15).

---

[67] *See* n.55, *supra*.

[68] Fisher claimed that his demand "was mindful of a range of cases dealing with jury awards on behalf of inmates who filed suit against correctional officers, and in some cases also municipalities, where awards amounted to $100,000.00, $312,000.00, $775,632.00, and $12,000,000.00." (Docket No. 273 at ¶ 10). The Court notes that these cases are factually dissimilar, from other jurisdictions, or both. The two Western District of Pennsylvania cases cited, *McLaughlin v. Allegheny County*, (W.D. Pa. Civil Action No. 05-1037) and *Kerwin v. McConnell*, (W.D. Pa. Civil Action No. 05-93), were sexual assault cases. The cases from other jurisdictions included *Jones v. Prison Health Services, Inc.*, (Ct. Comm. Pl. Erie Cnty. 2008) from the Court of Common Pleas of Erie County. The Middle District of Pennsylvania matter, *DeCarlo v. United States*, (M.D. Pa. Civil Action No. 00-1059), was not a § 1983 case; rather, it was a medical malpractice case brought under the Federal Tort Claims Act involving an inmate's medical treatment for his heart attack. Finally, the *Fox ex rel. Fox v. Barnes* case, (N.D. Ill. Civil Action 09-5453), involved a prisoner with a seizure disorder and was brought in the Northern District of Illinois. Plaintiff in that case had substantial damages, as he was diagnosed with inter-cranial hemorrhaging from a ruptured aneurysm, causing him to suffer permanent brain damage due to defendants' substandard or lack of treatment. The jury

Certainly, the parties had vastly disparate views as to this case's value. Thus, the decision to pursue Early Neutral Evaluation before Judge Benson was appropriate, as it should have provided both parties and counsel with a realistic view of the case, especially given Judge Benson's former service as a Magistrate Judge of this Court and his extensive mediation experience.[70]

This Court and Judge Lenihan also spent considerable time in attempting to resolve this issue, despite the parties' positions. (*See* Docket Nos. 109, 144). During same, the Court has previously expressed concern about Fisher's posture in negotiating, given his interest in this case versus that of his client. Leading up to the June 2013 trial date, Fisher's demand remained at $1.3 million, while his client had suggested "a very, very modest sum, along with an apology."[71] (Docket No. 132); (Docket No. 300 at 16:25-17:1). At the June 2013 Pretrial/Settlement Conference, Defendants offered $5,000.00 to settle. (Docket No. 273 at ¶ 12). Reflecting on same, the Court commented as follows during the September 17, 2014 Hearing:

> Whether he did or did not, maybe from his point of view, for reasons of principle, perhaps lack of consent from his clients, analysis of the case, that it was defensible given the posture, he has every right to try a case.
>
> But having said that, you and I both know, we were involved, you and I, with the settlement conference. And you know what your initial demand was as you provided it to me and you know where

---

awarded $11,000,000.00 in compensatory $1,000,000.00 in punitive damages. None of these facts were presented here.

[69] Defendants did not make an offer of judgment in this case, which, pursuant to FED.R.CIV.P. 68(d), could have curtailed the amount of fees they incurred. The Supreme Court has held that the "costs" referred to in Rule 68 encompass § 1988 attorneys' fees, if the offer of judgment clearly says so. *Marek v. Chesny*, 473 U.S. 1 (1985).

[70] *See* n.8, *supra*.

[71] During the trial, counsel engaged in argument outside the presence of the jury relative to Fisher's conduct during this litigation. During same, the Court noted:

> I think you should have taken me seriously last July when I spent an entire day having a settlement conference with you all and your client, Mr. Wise, in a very tearful state indicated to me what he was ultimately looking for in this case. And to that end, I specifically recall what he was looking for and the amount he was looking for and he was looking for an apology.

(Apr. 11, 2014 Trans. at 80:18-24). Fisher responded, "Correct." (*Id.* at 80:25).

you ultimately went. And you also recall that you had a very distraught client, i.e., Mr. Wise, and at one point, Mr. Wise suggested a very, very modest sum, along with an apology.

Now, his wife, who was not a named party, seemed to be of another ilk because she seemed to think that there may be gold at the end of this rainbow. But be that as it may, given the nature of this case, given the claims that were made, given where we were vis-à-vis proof, given the fact that you had a client who was saying to me as the judge, that he wanted a very modest sum, why wasn't that the demand? Instead I kept hearing about the fact that you and your law firm had $220,000 of attorney fees involved in this case.

(Docket No. 300 at 16:16-17:10); *see also* (Docket No. 273 at 3-4) ("Following Plaintiff's June 24, 2013 demand, during the June 2[6], 2013 settlement conference held by the Court, Plaintiff indicated that he would accept substantially less than his demand, provided that the Defendants offered him an apology for their conduct as alleged.").

In light of these circumstances, the Court finds it necessary to address the potential conflict which arises where a client's willingness to settle for an amount is in direct contravention to his attorney's desire to recover his fees.[72] As explained in a 2004 article, "[l]awyers must still take care . . . to ensure that they do not pressure clients to make an 'altruistic' decision. It is only legitimate to pursue fees with genuine support from the client.

---

[72] Upon further consideration of the negotiations in this case, the Court suggests that if it is faced with such a conflict in a future settlement conference, it will likely order another attorney to counsel Plaintiff or another Judge to intervene. That suggestion was made by Joyal during trial, but the Court declined as it does not have funds to pay counsel for such consultation. With more time, the Court could potentially secure *pro bono* assistance from one its ADR neutrals. Interestingly, the State Bar of California's Standing Committee on Professional Responsibility and Conduct issued a formal opinion on the hypothetical situation when an attorney ("Attorney A") for a plaintiff in a civil rights action has incurred $75,000 in fees and costs in a case and defendants offer a lump-sum of $25,000 to settle the case. State Bar of Cal. Standing Comm. on Prof. Resp. and Conduct, Formal Opinion Interim No. 98-0001, *available at* http://www.calbar.ca.gov/Portals/0/documents/publicComment/2005/Prop-Ethics-Opin-Atty-Fees.pdf (last visited Apr. 16, 2015). In such a situation, if plaintiff wants to accept the settlement offer and Attorney A wants to recover his fees, the Committee notes that "[t]he dual nature of the negotiations creates a conflict of interest which, when presented to a trial court, imposes on it the obligation to determine whether or not a fair balancing of the interests of the plaintiff and the plaintiff's attorney is reflected in the negotiations." *Id.* at 3. The Committee found that the attorney has the "normal obligation to advise Client of the alternatives and their foreseeable consequences, while being mindful of the obligation to put the Client's interests first." *Id.* (citing *Considine Co. v. Shadle, Hunt & Hagar*, 187 Cal. App. 3d 760 (1986). If the attorney and client were unable to reach an agreement on fees, in this circumstance, "he would be opposing the client's position on settlement, justifying, if not requiring, his request to withdraw." *Id.*

Otherwise, the attorney will be acting against the interests the client in violation of Model Rule 1.7(b)(1)."[73] Daniel Nazer, *Conflict and Solidarity: The Legacy of Evans v. Jeff D.*, 17 GEO. J. LEGAL ETHICS 499, 515 (2004).[74] The following excerpt from an earlier law review article aptly summarizes the general ethical considerations:

> The Model Code's general rule on personal conflicts of interest states, "Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." Under this rule the attorney's financial interest must threaten to prejudice his loyalty to his client before there is a conflict of interest. The attorney is permitted to represent the client in spite of the conflict if the client consents after full disclosure.

Lloyd B. Snyder, *Ethics and the Settlement of Civil Rights Cases: Can Attorneys Keep Their Virtue and Their Fees?* 16 N.M.L.REV. 283, 302-03 (1986).

Similarly, in Pennsylvania, "[e]ven where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests." Pa. RPC Rule 1.7 at cmt. 8. Other articles have examined this ethical dilemma in civil rights litigation  and explained that, "[a]n attorney's entitlement to statutory fees for successfully enforcing congressionally favored rights does not diminish his duty to provide disinterested counsel." Editors, *Settlement Offers Conditioned upon Waiver of Attorneys' Fees: Policy, Legal, and Ethical Considerations*, 131 U.PA.L.REV. 793 (1983).

---

[73] Model Rule 1.7(b)(1) (2002) requires an attorney to avoid a conflict of interest unless "the lawyer reasonably believes the representation will not be adversely affected."

[74] *See also* Lloyd B. Snyder, *Ethics and the Settlement of Civil Rights Cases: Can Attorneys Keep Their Virtue and Their Fees?* 16 N.M.L.REV. 283, 302-03 (1986) ("It is not possible to construct a world in which an attorney's loyalty to his client is completely insulated from his personal and economic interests. The attorney's interest in his fee inevitably will be different than the client's interest in the results of a law suit.").

This apparent conflict is far from novel or infrequent,[75] as "a number of statutes authorize the award of 'costs and expenses, including attorney's fees.'" *Marek v. Chesny*, 473 U.S. 1, 44 (1985). The United States Court of Appeals for the Eighth Circuit addressed this conflict in the context of an employment discrimination case:

> This situation may raise a serious ethical concern, as two circuits have cautioned, because counsel would be placed in the position of negotiating a fee ultimately destined for his pocket at the same time that all thoughts ought to be singlemindedly focused on the client's interests.

*Obin v. Dist. No. 9 of Int'l Ass'n of Machinists & Aerospace Workers*, 651 F.2d 574, 582-83 (8th Cir. 1981) (citing *Mendoza v. United States*, 623 F.2d 1338, 1352-53 (9th Cir. 1980) *disapproved of by Evans v. Jeff D.*, 475 U.S. 717, 734-35 (1986); *Prandini v. National Tea Co.*, 557 F.2d 1015, 1021 (3d Cir. 1977), *disapproved of by Jeff D.*, 475 U.S. 717; *Regalado v. Johnson*, 79 F.R.D. 447, 451 (N.D. Ill.1978)).

The Court is certainly mindful that the Supreme Court of the United States in *Evans v. Jeff D.* did away with the Third Circuit's prohibition on simultaneous negotiations and held that it is not necessarily unethical for a defendant to make an offer to simultaneously settle the plaintiff's claim on the merits and the claim for fees. 475 U.S. 717, 734-35 (1986). The Court explained that a § 1988 claim for fees belongs to the *party*, not his or her attorney. *Id.* at 730,

---

[75] This conflict was also addressed in the context of class action litigation in 1985 by the Third Circuit's Task Force on Court Awarded Attorney Fees:

> When a large attorney's fee means a smaller recovery to plaintiff, a significant conflict of interest between client and attorney is created. Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations.

*Court Awarded Attorney Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237, 266 (1985). Similarly, the United States Court of Appeals for the Ninth Circuit noted that, "[i]f fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) (citing *Court Awarded Attorney Fees*, 108 F.R.D. at 266).

n.19. It also held that the fees are considered part of "the arsenal of remedies available to combat violations of civil rights, a goal not invariably inconsistent with conditioning settlement on the merits on a waiver of statutory attorney's fees." *Id.* at 732. Following same, the Court of Appeals has acknowledged that this holding "may create tensions for counsel for civil rights plaintiffs in negotiating settlements," but, "we, as well as the district courts, are bound by the holding and its rationale." *Phillips v. Allegheny Cnty, Pa.*, 869 F.2d 234, 239 (3d Cir. 1989).

To that end, Pennsylvania Rule of Professional Conduct 1.2 provides:

> [A] a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. . . . **A lawyer shall abide by a client's decision whether to settle a matter. . .**

Pa. RPC 1.2. (emphasis added); *see Midiri Models, Inc. v. Expressions Modeling & Talent Agency, Inc.*, 1990 WL 96663, at *1 (E.D. Pa. 1990) (quoting Rule 1.2); *Shelhammer v. Erie Ins. Co.*, 29 Pa. D. & C.4th 253, 256 n.3 (Ct. Com. Pl. Allegh. Cnty. 1995) (same).

Additionally, the Court notes that a sister-court in the Third Circuit sanctioned a Plaintiff's attorney under § 1927 for continuing to pursue an inflated economic damages claim in bad faith, despite evidence demonstrating that the amount of loss was trivial, at most. *Alphonso*, 356 F. Supp. 2d at 454 (District of New Jersey holding: "While Mr. Sandler may not have initiated his client's half-million dollar economic damages claim in bad faith, his relentless pursuit of that claim after the evidence demonstrated, at most, a comparatively trivial amount of loss shows bad faith by Mr. Sandler."). In *Alphonso*, the Defendants argued that Plaintiff's counsel's decision to drop the economic loss claim mid-trial constituted bad faith. *Id.* at 454. The Court agreed, finding that the bases for the decision to drop the claim at trial were known to counsel "long before the trial date neared." *Id.*

While the attorney in *Alphonso* and Fisher seemingly shared distorted views of the worth of their clients' claims, the Court distinguishes the two. Counsel in *Alphonso* admitted that he knew *before* trial that he did not plan on pursuing the economic loss claim, yet he refused to drop it until the last day of Plaintiff's case-in-chief. *Id.* at 454-55. In this Court's estimation, Fisher's settlement posture was certainly unreasonable, given the facts and the applicable law. Further, the Court had ruled in favor of Defendants relative to reference to Wise's conviction at trial, (Docket No. 228), and, given discovery abuses, precluded his counsel from introducing evidence of Wise's continued seizures, thus limiting his damages claim,[76] (CM/ECF Minute Entry, Apr. 9, 2014). At that point, Fisher should have reconsidered his settlement posture. Ultimately, he did and reduced his demand to $25,000 and an apology on April 12, 2014, (Docket No. 285-2 at 3), after the Court granted, in part, Defendants' Motion for Judgment as a Matter of Law, dismissing almost all of the remaining claims. (Docket No. 247). In the interim, Defendants had spent time and money preparing for trial, bringing motions, and trying the case, the individual Defendants lost time from work, and Washington County may have incurred expenses in replacing their services.[77]

In light of his relative inexperience as a trial attorney in this area, the Court suggests that Fisher could have conferred with another Plaintiff's civil rights attorney to evaluate Wise's case at the outset. Comment 1 to Rule 1.1 notes that whether it is feasible to consult with "a lawyer of established competence in the field in question" is one factor in "determining whether a lawyer employs the requisite knowledge and skill in a particular matter." Pa. RPC 1.1 at cmt. 1. Perhaps,

---

[76] Further, he did not have expert support for this claim. *See* Section IV.C.2.f, *supra.*

[77] As to the amount Defendants may claim, the Court points out that Joyal's total bill is of record, (Docket No. 292-2) (sealed), and, per various representations made to this Court, Washington County's deductible was $25,000 which covered attorneys fees and costs, in part. But, no proof of Defendants' lost wages or other costs has been submitted to this Court. Thus, Fisher has not been provided particularized notice consistent with § 1927 case law in this Circuit, *see, e.g.*, *Jones v. Pittsburgh Nat. Corp.*, 899 F.2d 1350, 1357 (3d Cir. 1990), as to lost wages or other costs.

with such guidance, Fisher's zeal would have been tempered and his initial demand would have been more reasonable. Further, when he and his client were clearly at an impasse relative to their settlement positions in June 2013, he could have sought guidance from the Allegheny County Bar Association's and the Pennsylvania Bar Association's ethics hotlines.[78]

Nevertheless, Wise's Eighth Amendment claims against King and Washington County went to the jury. As such, the Court notes the comments of Judge Terrence McVerry:

> The Court is loath to chill the exercise of Mr. Yurisic's constitutional rights by awarding fees, merely because the jury did not find in his favor. [. . . ] Nor will the Court penalize Plaintiff for refusing Defendant's settlement offers, despite the Court's encouragement that he accept. Even though Plaintiff, in retrospect, would have fared better financially if he accepted a settlement, Mr. Yurisic was entitled to have his day in Court and to seek an "official" determination from a neutral fact-finder that his rights had been violated.

*Yurisic v. Carter*, 2010 WL 3811455, at *3 (W.D. Pa. 2010).

While Fisher's misjudgment of the merits and demerits of this case resulted in an early and long-lasting unreasonable settlement posture until it was too late, his acts and omissions in such negotiations do not amount to bad faith, particularly given *Jeff D.* and its progeny.[79]

### E. Fisher's Conduct Relative to the Inadvertent Disclosure

Joyal argues that Fisher acted in bad faith with regard to the inadvertent disclosure of King's memorandum. (Docket No. 300 at 9:10-23). Fisher responds that the Court has already ruled on this issue. (*Id.* at 25:10-22); (Docket No. 163 at 7). Indeed, in September 2013 the Court

---

[78] The Allegheny County Bar Association's Professional Ethics Committee, "upon any request of any member of the association, its Board of Governors, or any Committee or Section, gives its opinion on the proper interpretation of the Code of Judicial Conduct or Rules of Professional Conduct, and on the applicability to a particular state of facts not involving questions of judicial discretion or decision." *See* http://www.acba.org/OfficerAssignments (last visited Apr. 16, 2015). Similarly, the Pennsylvania Bar Association provides confidential free advisory opinions "based upon a review of a member's prospective conduct by members of the PBA Committee on Legal Ethics and Professional Responsibility." *See* http://www.pabar.org/public/Membership/ethics.asp (last visited Apr. 16, 2015).

[79] The Court noted that both parties engaged in good faith negotiations at the Pretrial/Settlement Conference. (Docket No. 144 at 2).

denied Joyal's Motion for Disqualification relative to the disclosure, finding that he waived any privilege to the memorandum. (Docket No. 163). As discussed in the Court's ruling and herein, Joyal did not file a motion to claw back the document even though Judges Kelly and Lenihan both advised him to do so. (*Id.* at 7). The Court agrees that it has already addressed this issue and declines to sanction Fisher on this basis.

### F. Counsel's Conduct

As the standard for the present Motion requires this Court to review this litigation in its entirety, *see* Section III, *supra*, the Court now comments on counsel's conduct. All too frequently, Fisher's and Joyal's lack of professionalism interfered with their judgment, strategy, and advocacy on behalf of their clients.

Further, their relentless bickering and rancor made this litigation more onerous on the Court.[80] As they repeatedly failed to confer as required by the Local Rules, then Chief Magistrate Judge Lenihan, on many occasions, denied their Motions, granted them, in part, or admonished counsel for their failure to file the requisite certificate of conferral. *See, e.g.* (CM/ECF, Text Order, June 9, 2011); (CM/ECF Text Order, Dec. 6, 2011); (Docket No. 47); *see also* Section II.A., *supra*. Counsel were made aware of the Court's displeasure with their conduct in early 2012, when Judge Lenihan admonished them on the public docket. (CM/ECF, Text Order, Feb.

---

[80] "A lawyer should be considerate of the time constraints and pressures on the court in the court's effort to administer justice and make every effort to comply with schedules set by the court." Pa. Code of Civility § 99.3, n. 11. The Preamble of the Rules of Professional Conduct explains:

> The conduct of lawyers and judges should be characterized at all times by professional integrity and personal courtesy in the fullest sense of those terms. Integrity and courtesy are indispensable to the practice of law and the orderly administration of justice by our courts. Uncivil or obstructive conduct impedes the fundamental goal of resolving disputes in a rational, peaceful and efficient manner.
>
> The following principles are designed to encourage judges and lawyers to meet their obligations toward each other and the judicial system in general. It is expected that judges and lawyers will make a voluntary and mutual commitment to adhere to these principles

*Id.* at Preamble, § 99.1.

17, 2012) ("The Court finds it very unfortunate that counsel in this case are unable to agree on a simple request regarding the location of a deposition of the Plaintiff. It has always been the goal of this court to promote respect and professionalism among attorneys practicing before it and the goal of the Allegheny County Bar Association to promote collegiality among lawyers in the bar. Counsel are again encouraged to attempt to work out these discovery issues in a professional and respectful manner."). Such public admonition should have encouraged them to alter their conduct; yet, that did not occur.

Indeed, the conduct of both counsel multiplied the proceedings. Pa. RPC 3.2 (Expediting Litigation). Motions practice surrounding the inadvertent disclosure as part of a claim for Fisher's disqualification delayed the litigation, *see* Section II.C.2, *supra*. Additionally, Fisher should have arranged for and taken Wise's deposition for use at trial. Instead, the Court spent an inordinate amount of time editing Plaintiff's deposition. (*See* Docket No. 209). As discussed earlier, Fisher wasted the Court's and Murphy's time when he appeared on April 8, 2014 unnecessarily. *See* Section IV.C.2.e, *supra*.

The Court also notes Joyal's last two Motions for Sanctions and Fees, (Docket Nos. 285, 288). The Rule 11, § 1988, and inherent authority claims were withdrawn or denied, given their patent untimeliness. (Docket Nos. 293, 294, 300, 302); Pa. RPC 3.1 (Meritorious Claims and Contentions). Joyal also failed to cite controlling case law or provide supporting citations to the record for the majority of the assertions in their sanctions motions and supporting briefs. (Docket Nos. 285, 288, 304, 306, 314). Further, he did not set forth the specific relief requested in the § 1927 Motion or the proposed order accompanying same. (Docket Nos. 285, 286).

Similarly, Joyal's Motion regarding Judge Benson's ENE was not well-taken. Joyal, as a long-time practitioner in Western Pennsylvania, should have known better. Pa. RPC 3.1

(Meritorious Claims and Contentions). As the Court wrote in its July 11, 2014 Memorandum

Order and Opinion:

> permitting discovery of the ENE proceedings would fly in the face
> of this contract, relevant statutes, our local ADR Rules, as well as
> the overwhelming case law on this issue. *See, e.g., Taylor v.
> Prudential Ins. Co. of Am.*, 91 F. App'x 746, 747 (3d Cir. 2003)
> (affirming district court's conclusion "that the plaintiff should be
> bound by her agreement to keep the proceedings confidential").

(Docket No. 284 at 3).

The Court was also burdened by counsel's hostile email correspondence, which were

attached as exhibits to various filings in this case. For example, the June 9, 2011 email from

Joyal to Fisher attached to Defendants' June 10, 2011 Motion to Compel, reads as follows:

> Since I see that you seem to be intent on making personal attacks
> on me without any basis in fact I see absolutely no need to discuss
> this with you by phone. . . . It is clear to me from this filing and my
> personal observation of you – as well as conversations that I have
> had with other counsel that you have interacted with in the
> past – that you have no sense of personal or professional
> demeanor. . . Based on your emails I believe that the least amount
> of personal contact that we have the more smoothly this litigation
> will proceed. That is unfortunate.

(Docket No. 21-5 at 1). Joyal's email is correct to the extent that counsel's failure to have

personal contact during this litigation is unfortunate.

Not to be outdone, Fisher responded to Joyal's email later that day:

> Given your condescending and arrogant approach to every
> interaction I've experienced with you thus far, you've got to be
> delusional to claim that I have no sense of personal or professional
> demeanor. It strains the bounds of all professionalism to tolerate
> your demeaning approach to litigation. I won't be bullied by you
> so get ready for a rough road if you think you can talk down to me
> and my clients. Your flagrantly inflammatory and unprofessional
> actions will get you nowhere with me.

(Docket No. 21-7 at 1). Fisher was right to this extent: the parties and the Court were in for a

rough road with regard to this litigation. This Court has been made to ride this rough road spanning more than sixty filings over eleven months beyond the jury's verdict.

In this context, courts have expressed their frustration with counsel who did not comport themselves professionally. *See, e.g.*, *Marino v. Usher*, 2014 WL 2116114, at *7 (E.D. Pa. May 21, 2014) ("Cooperation between opposing counsel is entirely consistent with a lawyer's obligations to his or her client, and ensures the efficient and rational resolution of civil litigation.") (citing Pa. RPC 3.5(g) ("A lawyer shall not engage in conduct intended to disrupt a tribunal"); *id.* at cmt. 5 ("The duty to refrain from disruptive conduct applies to any proceeding of a tribunal, including a deposition.")); *see also Grider*, 580 F.3d at 125 ("one expects . . . civility and professionalism" from experienced attorneys during discovery); *Huggins v. Coatesville Area Sch. Dist.*, 2009 WL 2973044, at *4 (E.D. Pa. Sept.16, 2009) ("Treating an adversary with advertent discourtesy, let alone with calumny or derision, rends the fabric of the law."); *GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 184 (E.D. Pa. 2008) ("The issue of how to rein in incivility by counsel in depositions has been the subject of considerable interest in the legal profession for some time.").

Upon consideration of counsel's conduct and in line with the Third Circuit's reasoning in *Ferguson*, this Court departs from the general preference against inherent powers sanctions as it finds that counsel's conduct was egregious. *Ferguson*, 454 F. App'x at 114 (citing *In re Prudential*, 278 F.3d at 189); *see also Chambers*, 501 U.S. at 50 (a district court may rely on its inherent authority when, in its "informed discretion, . . . neither the statute nor the Rules are up to the task"). To that end, "[a]mong the implied and incidental powers of a federal court is the power to discipline attorneys who appear before it." *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1224 (3d Cir. 1995) (quoting *Chambers*, 501 U.S. at

43) (other quotations and citations omitted).

Given their respective failures in this regard, Fisher and Joyal shall attend a CLE on professionalism by the end of the calendar year. *See In re Cendant Corp.*, 260 F.3d 183, 200 (3d Cir. 2001) (noting that, before invoking its inherent authority, the court shall "ensure that the sanction is tailored to address the harm identified"); *see also Johnson*, 2015 WL 1004308, at *13 (same).

Finally, counsel are urged to comport with the Code of Civility, particularly Number 5: "[a] lawyer should abstain from making disparaging personal remarks or engaging in acrimonious speech or conduct toward opposing counsel or any participants in the legal process and shall treat everyone involved with fair consideration," in further dealings before this Court. *See also Delamater v. Norgren Kloehn, Inc.*, 2014 WL 671039, at *1 (M.D. Pa. Feb. 21, 2014) (noting the "unusual amount of personal bickering and squabbling between the attorneys in this case.").

## V.    CONCLUSION

Consistent with this Court's March 31, 2015 Order, (Docket No. 321), mindful of the maxim that sanctions should be granted sparingly, *In re Orthopedic*, 193 F.3d at 796, and after much consideration, Defendant's Motion for Sanctions, (Docket No. 285) is GRANTED, in part, and DENIED, in part. Specifically, the Court finds that Fisher's decision to maintain a punitive damages claim against Washington County and the individual Defendants in their official capacities was in bad faith. Similarly, the Equal Protection claim was maintained in bad faith once Fisher recognized that he could not prove same. The Court will not further sanction Fisher as to the discovery issues raised by Defendants, given the Court's ruling on a related Motion at the outset of trial. *See* Section II.D., *supra.* Nor will the Court sanction Fisher for his conduct in

failing to depose all of the individual Defendants, in failing to edit Wise's videotaped deposition, in calling Melencheck as a witness, in settlement negotiations, in his conduct relative to the inadvertent disclosure, in failing to visit WCCF, in his dealings with photographer Murphy, in failing to call an expert, or in his late dismissal of two individual nurse Defendants.

No later than April 30, 2015, Defendants shall file an affidavit and supporting documentation setting forth all attorneys fees, costs and expenses incurred in defending the punitive damages claim against Washington County and the individual Defendants in their official capacities and the Equal Protection claims until the time of their dismissal.

Further, Fisher shall attend a CLE program on the trial of a § 1983 case. Fisher and Joyal shall both attend a CLE program on professionalism by the end of calendar year 2015. Proof of such attendance at said CLEs, by way of an Affidavit and certificate of attendance, shall be filed, with the Court, by both counsel by January 4, 2016.[81]

An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


Date: April 17, 2015

cc/ecf: All counsel of record

---

[81] The Court notes that Joyal and Fisher have already filed their Affidavits and certificates of attendance for said CLEs in compliance with the Court's Order of March 31, 2015, (Docket No. 321). (Docket Nos. 322, 323).